Christopher R. Pitoun (SBN 290235)
christopherp@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152

Steve W. Berman (*pro hac vice pending*)
steve@hbsslaw.com
Thomas E. Loeser (SBN 202724)
toml@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH WILLIAMS, BECKIE REASTER, REBECCA MURPHY, individually, and on behalf of all others similarly situated,<br><br>                                   Plaintiffs,<br><br>        v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, COUNTRYWIDE HOME LOANS, a New York corporation, COUNTRYWIDE BANK, N.A., a national association, BANK OF AMERICA CORPORATION, a Delaware corporation, LANDSAFE, INC., a Delaware corporation, LANDSAFE APPRAISAL, INC., a California corporation,<br><br>                                   Defendants. | No.  2:16-cv-4166<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR DAMAGES**<br>(1) Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c));<br>(2) Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(d));<br>(3) Violations of the Real Estate Settlement Procedures Act (12 U.S.C. §§ 2607)<br>(4) Violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.*);<br>(5) Violations of Florida's Deceptive and Unfair Trade Practices Act (FLA. STAT. §§ 501.201 *et seq.*);<br>(6) Unjust Enrichment<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT FOR DAMAGES

# TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION .................................................................. 1

II.    JURISDICTION AND VENUE .......................................................... 4

III.   PARTIES ........................................................................................... 5

     A.    California Plaintiff ................................................................... 5

         1.    Elizabeth Williams ...................................................... 5

     B.    Florida Plaintiffs .................................................................... 5

         1.    Beckie Reaster. .......................................................... 5

         2.    Rebecca Murphy. ....................................................... 5

     C.    Defendants ............................................................................ 5

     D.    Unnamed Co-Conspirators and Members of the Enterprise ... 8

IV.   FACTUAL BACKGROUND ............................................................... 9

     A.    Real Estate Appraisal Standards ............................................ 9

     B.    Countrywide's Fraudulent Appraisal Scheme ..................... 12

     C.    Defendants Defraud Plaintiffs ............................................. 16

         1.    Plaintiff Elizabeth Williams ....................................... 16

         2.    Plaintiff Beckie Reaster .............................................. 20

         3.    Plaintiff Rebecca Murphy ........................................... 23

V.     TOLLING OF THE STATUE OF LIMITATIONS ......................... 28

     A.    Equitable Estoppel ............................................................... 28

     B.    Equitable and *American Pipe* Tolling ................................. 29

VI.   CLASS ACTION ALLEGATIONS ................................................. 30

FIRST CLAIM FOR RELIEF VIOLATIONS OF THE RACKETEER
INFLUENCED AND CORRUPT ORGANIZATIONS ACT
(18 U.S.C. § 1962(C)) ....................................................................... 34

     A.    The Rico Enterprise ............................................................. 34

     B.    The Predicate Acts ............................................................... 35

1
2
3

SECOND CLAIM FOR RELIEF VIOLATION OF THE RACKETEER
        INFLUENCED AND CORRUPT ORGANIZATIONS ACT,
        CONSPIRACY TO VIOLATE TITLE 18 UNITED STATES
        CODE  SECTION 1962(C) (18 U.S.C. § 1962(D)).........................................40

THIRD CLAIM FOR RELIEF VIOLATIONS OF THE REAL ESTATE
        SETTLEMENT PROCEDURES ACT (12 U.S.C. §§ 2607) .........................41

FOURTH CLAIM FOR RELIEF VIOLATION OF UNFAIR
        COMPETITION LAW (CALIFORNIA BUSINESS &
        PROFESSIONS CODE §§ 17200 *ET SEQ.*) ....................................................42

FIFTH CLAIM FOR RELIEF VIOLATION OF FLORIDA DECEPTIVE
        & UNFAIR TRADE PRACTICES ACT
        (FLA. STAT. §§ 501.201 *ET SEQ.*)................................................................46

SIXTH CLAIM FOR RELIEF UNJUST ENRICHMENT .......................................47

PRAYER FOR RELIEF ..........................................................................................48

DEMAND FOR JURY TRIAL ...............................................................................49

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

010606-11  878877 V1

# I.   NATURE OF THE ACTION

1.   This case concerns a devious scheme perpetrated by Defendants to circumvent legal obligations imposed on Countrywide and BofA, as federally insured and regulated financial institutions, to perform real estate appraisals in accordance with the strict ethical and competency rules of the Uniform Standards of Professional Appraisal Practice ("USPAP"), in connection with the sale and refinancing of single family homes during the period January 1, 2003 to December 31, 2008.  The scheme allowed Defendants to eliminate the delay associated with performing and fulfilling the strict requirements of a USPAP appraisal, and rapidly close loans, all to the financial detriment of consumers who were forced to pay for legally-mandated USPAP "appraisals" that were never performed.  In the end, through their uniform practice of systematically corrupting the appraisal process in connection with loans originated by Countrywide, Defendants produced so-called "appraisal reports" which were *not* legitimate opinions of the value of property.  Rather, they were reports of a predetermined value that favored Countrywide's cause of rapidly closing loans

2.   During the period 2003 to 2008, Countrywide became the largest home mortgage lender in the United States, having originated over $400 billion in loans each year.  In addition to its thriving loan origination and service business, Countrywide also became a leader in the securitization of home loans.  Along the way, Countrywide reaped hefty profits based on the quantity, not on the quality, of the loans it successfully originated and sold to Wall Street investors.

3.   Recognizing that it needed to close as many loans as possible to maintain its hefty profit margins, Countrywide began removing the "toll gates" that slowed or obstructed the loan origination process.  One of those "toll gates" was the ever important appraisal.

4.   Obtaining an appraisal is a critical element of the home buying or refinancing process because it provides a buyer or homeowner with an accurate, objective and supportable opinion of a property's value; and it protects the financial

and public policy interests in real estate transactions involving federally-regulated and federally-insured institutions like Countrywide and BofA. In that regard, Title XI of the Financial Institutions Reform Act of 1989 ("FIRREA") *requires* financial institutions like Countrywide and BofA to obtain regulated appraisals, performed in strict compliance with USPAP's ethical and competency requirements, in connection with a sale or refinancing of property.

5.     At the core of the applicable federal and state laws, as well as the ethics and competency rules of USPAP, is the requirement that professional appraisers be fully independent and objective in reaching their opinions of value.

6.     Because the legally-mandated USPAP appraisal had the potential to delay or terminate a prospective loan transaction and, thus, limit Countrywide's ability to securitize and sell such loans to Wall Street, Countrywide opted for a different course of action. It and its subsidiaries and affiliates operated an illegal enterprise whose purpose was, in part, to have homeowners pay for an appraisal which was performed with indifference to the appraisal's accuracy and/or was not in fact a USPAP compliant appraisal, and instead was a phony appraisal used to facilitate the sale of a home financed by a Countrywide Loan.

7.     As part of the lending transaction, Countrywide required that borrowers use LandSafe as its "approved" USPAP appraisal vendor. In reality, LandSafe was Countrywide's captive, wholly-owned subsidiary over which Countrywide exerted complete dominion and control and, through LandSafe, Countrywide controlled the process and outcome of the so-called USPAP appraisal, with indifference to the appraisal's accuracy. These facts were not disclosed to prospective borrowers and homeowners.

8.     Countrywide and LandSafe agreed to knowingly, fraudulently, systematically and uniformly produce phony so-called USPAP "appraisals" on home loans originated by Countrywide which were not performed in accordance with required USPAP standards and/or were performed with indifference to the appraisal's

accuracy for the purpose of facilitating the sale of a home financed by a Countrywide loan.

9.     To do so, LandSafe, at Countrywide's behest, employed a uniform practice of engaging in systematic, unlawful conduct with respect to the preparation of all appraisals for Countrywide loans originated from 2004 through 2008.  These appraisals were performed with indifference to the appraisals' accuracy, and instead were designed to ensure that appraisal reports contained an inflated or manipulated property "value" which always exceeded the Countrywide loan amount, regardless of the true value of the property.  In furtherance of this uniform practice, LandSafe and Countrywide engaged in conduct which included:

- requiring borrowers in the affiliated business disclosure statements to use LandSafe as an appraisal provider;

- refusing to utilize bona fide, independent appraisers to prepare the legally mandated USPAP appraisals;

- paying generous fees to, and otherwise rewarding, a select list of appraisers who agreed to disregard USPAP's ethical and competency rules;

- paying generous fees to, and otherwise rewarding, a select list of appraisers who agreed to inflate property values or otherwise participate in the fraudulent scheme;

- blacklisting and otherwise retaliating against appraisers who refused to disregard the "independence" of the USPAP appraisal process, who refused to inflate property values, or who refused to otherwise participate in the fraudulent scheme; and

- withholding information from appraisers to ensure the creation of phony so-called USPAP appraisals.

10.     In effect, through their uniform practice of systematically corrupting the appraisal process, Defendants produced so-called "appraisal reports" with indifference to the appraisals' accuracy, which were *not* legitimate opinions of value.  In fact, Countrywide instead focused on directing captive appraisers to provide pre-textual

values which favored Countrywide's cause of rapidly closing loans.  Given that the values provided by Landsafe's appraisals were not accurate assessments of a home's value, there was no reason for a prospective homeowner to pay for Landsafe's appraisals.

11.     And, although obtaining an USPAP appraisal was an obligation imposed on Defendants by law, they nevertheless sought to pass on the cost of doing so to borrowers.  Thus, adding insult to injury, Countrywide and LandSafe falsely represented to borrowers that they had performed "appraisals" on their properties which complied with the applicable legal and ethical USPAP standards and then required borrowers to *pay* between $300 and $600 for these so-called "appraisals."  In the end, however, Countrywide charged borrowers hundreds of millions of dollars for legally-mandated USPAP appraisals that were never performed.

12.     In this action Plaintiffs, on behalf of a proposed class of all persons who paid for an appraisal from LandSafe seek to recover all fees paid for an appraisal.  Plaintiffs assert claims under the Racketeer Influenced and Corrupt Practices Act, the Real Estate Settlement Procedures Act, and state statutory and common laws.

## II.     JURISDICTION AND VENUE

13.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of Plaintiffs are citizens of states different from Defendants.  Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are citizens.

14.     This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1961, 1962 and 1964.  This Court has personal jurisdiction over Defendants under 18 U.S.C. §1965.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law and common law claims because all of the

1    claims are derived from a common nucleus of operative facts and are such that

2    Plaintiffs ordinarily would expect to try them in one judicial proceeding.

3         15.    Venue lies within this judicial district under 28 U.S.C. § 1391(b), (c) and

4    (d), and under 18. U.S.C. § 1965, because each of the Defendants transacted business

5    in this District and because a substantial part of the events or omissions giving rise to

6    Plaintiffs' claims in this lawsuit occurred, among other places, in this District.

7                              **III.   PARTIES**

8    **A.   California Plaintiff**

9              **1.   Elizabeth Williams.**

10        16.    Plaintiff Elizabeth Williams is an individual residing in Richmond,

11   California and is a citizen of the State of California.

12   **B.   Florida Plaintiffs**

13             **1.   Beckie Reaster.**

14        17.    Plaintiff Beckie Reaster is an individual residing in New Smyrna Beach,

15   Florida and is a citizen of the State of Florida.

16             **2.   Rebecca Murphy.**

17        18.    Plaintiff Rebecca Murphy is an individual residing in New Smyrna

18   Beach, Florida and is a citizen of the State of Florida.

19   **C.   Defendants**

20        19.    Defendant Countrywide Financial Corporation ("Countrywide

21   Financial") is a Delaware corporation registered to do business throughout the United

22   States.  Countrywide Financial, through its subsidiaries Countrywide Home Loans and

23   Countrywide Bank, was engaged in mortgage lending.  It was at all relevant times the

24   publicly traded parent and holding company of the Countrywide family of companies,

25   which had their principal place of business and national headquarters at 4500 Park

26   Granada, Calabasas, County of Los Angeles, California.

27        20.    Defendant Countrywide Home Loans, Inc. ("Countrywide Home Loans")

28   is a New York corporation with its principal place of business and national

headquarters at 4500 Park Granada, Calabasas, County of Los Angeles, California.  It was at all relevant times a wholly owned and controlled subsidiary of Countrywide Financial and engaged in the business of originating mortgage loans.

21.     Defendant Countrywide Bank, N.A. ("Countrywide Bank") is a national banking association headquartered at 1199 North Fairfax Street, Suite 500, Alexandria, Virginia 22314.  Countrywide Bank is a wholly-owned and controlled subsidiary of Countrywide Financial and funds the loans originated by Countrywide Home Loans.

22.     Plaintiffs are informed and believe that Countrywide Financial, Countrywide Home Loans, and Countrywide Bank (collectively referred to herein as "Countrywide") together concocted the appraisal scheme alleged herein, and all stood to gain financially from the fraudulent appraisal scheme alleged herein.

23.     Defendant Bank of America Corporation ("BofA") is a Delaware Corporation, a bank holding company, and a financial holding company.  Its principal executive offices are located at 100 N. Tyron Street, Charlotte, North Carolina.

24.     On July 1, 2008, Countrywide Financial, and its subsidiaries merged with Defendant BofA and, as a result, BofA became a successor-in-interest to the Countrywide family of businesses, including Countrywide Financial, Countrywide Home Loans, Countrywide Ventures, Countrywide-KB, and Countrywide Bank, and assumed liability for their conduct alleged herein.

25.     In the months following the merger, BofA executed a plan to integrate Countrywide's businesses into BofA through a series of transactions by which BofA would acquire control over all of Countrywide's operations.

26.     In April 2009, BofA informed the Federal Reserve that it would "run the combined mortgage business" under the "Bank of America brand" and that Calabasas, California, in Los Angeles County, would be the "the national headquarters for the combined mortgage business."

27.     Bank of America integrated the former mortgage-origination business of Countrywide Financial, including Countrywide Bank, Countrywide Ventures, Countrywide-KB, and Countrywide Home Loans, into its own mortgage business and externally branded it as "Bank of America Home Loans."  Countrywide employees became BofA employees, and BofA announced that it "ended up with the largest [mortgage] servicing platform in the country."

28.     An April 27, 2009 BofA press release noted that "[t]he Bank of America Home Loans brand represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans, which Bank of America acquired on July 1, 2008."

29.     In the months following the Countrywide-BofA merger, BofA executives and spokespersons made public statements that Countrywide's liabilities were factored into BofA's purchase, and that BofA intended to "clean[] up" those liabilities.

30.     In a 2008 interview with the New York Times, BofA's former CEO Kenneth Lewis confirmed that "We looked at every aspect of the [Countrywide] deal, from their assets to potential lawsuits and we think we have a price that is a good price."

31.     On March 1, 2009, a BofA spokesperson stated that "We bought [Countrywide] and all of its assets and liabilities . . .  We are aware of the claims and potential claims against the company and have factored those into the purchase."

32.     Likewise, BofA's Form 10-K for 2009 acknowledges that "we face increased litigation risk and regulatory scrutiny as a result of the . . .  Countrywide acquisitions."

33.     In November 2010, BofA's current CEO Brian T. Moynihan addressed potential litigation arising from Countrywide's operations and stated "[t]here's a lot of people out there with a lot of thoughts about how we should solve this, but at the end of the day, we will pay for the things that Countrywide did."  One month later, he

- 7 -

again confirmed to the New York Times that "Our company bought it and we'll stand up, we'll clean it up."

34.    Plaintiffs are informed and believe that, in addition to BofA's successor liability for Countrywide's conduct alleged herein, BofA also continued the conduct alleged herein after its acquisition of Countrywide in July 1, 2008 through the end of the class period on December 31, 2008.

35.    Defendant LandSafe, Inc. ("LandSafe") is a Delaware corporation headquartered at 6400 Legacy Drive, Plano, Texas 75024.  LandSafe provides loan closing products and services such as credit reports and appraisals.

36.    Defendant LandSafe Appraisal Services, Inc. ("LandSafe Appraisal") is a California corporation headquartered at 6400 Legacy Drive, Plano, Texas 75024. LandSafe Appraisal is a wholly-owned and controlled subsidiary of LandSafe, Inc. with shared management and employees, and purports to offer appraisal services in connection with mortgage loan closings.  LandSafe and LandSafe Appraisal are collectively referred to herein as "LandSafe."

37.    Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

**D.    Unnamed Co-Conspirators and Members of the Enterprise**

38.    Each of the entities named below were members of the RICO Enterprise.

39.    KB Home is a Delaware corporation registered to do business throughout the United States.  It is the publicly traded holding company of the KB Home conglomerate of companies, which have their principal place of business at 10990 Wilshire Boulevard, Los Angeles, California.  At all relevant times, KB Homes maintained sales offices in Florida and California.

40.     Countrywide Mortgage Ventures, LLC ("Countrywide Ventures") is a Delaware limited liability company with its principal place of business and national headquarters at Countrywide Financial's headquarters.  It was, at all relevant times, a wholly owned and controlled subsidiary of Countrywide Financial.

41.     Countrywide KB Home Loans ("Countrywide-KB") is an unincorporated joint venture between KB Home and Countrywide Financial.  Countrywide-KB and was formed to receive customer mortgage lending services referrals from KB Home.

## IV.     FACTUAL BACKGROUND

### A.     Real Estate Appraisal Standards

42.     An appraisal is an integral part of a real estate loan transaction.  It provides a borrower or homeowner with the means to obtain an opinion of value from a licensed and qualified specialist.  It also provides protection for financial and public policy interests in real estate transactions with federally-insured financial institutions like Countrywide and BofA.

43.     Appraisals are typically governed by a number of uniform standards, regulations and laws.

44.     In 1989, Congress adopted Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").  See 12 U.S.C. §§ 3331 *et seq.* (hereafter "Title XI").  Title XI *requires* federally-insured financial institutions like Countrywide and BofA to obtain a written appraisal that strictly conforms to USPAP standards in connection with any real property insured by the Federal Housing Administration ("FHA").  See 12 U.S.C. § 1708(f).  Federal law also requires that such appraisals "be performed in accordance with uniform standards, by individuals who have demonstrated competence and whose professional conduct is subject to effective supervision."  *Id.* at § 1708(f)(1).  Additionally, such USPAP appraisals "shall be performed in accordance with generally accepted appraisal standards," and each appraisal is to be a written statement that is "independently an[d] impartially prepared by a licensed or certified appraiser setting forth an opinion of defined value

of an adequately described property as of a specific date, supported by presentation and analysis of relevant market information." 12 U.S.C. § 1708(f)(1)(A), (B).  Absent Countrywide's purported compliance with these laws, it could not have extended offers of credit to prospective borrowers and thus, it could not have charged them for appraisals.

45.    The USPAP requires appraisers to conduct their appraisals independently and competently: "An appraiser must perform assignments with impartiality; objectivity, and independence, and without accommodation of personal interests.  In appraisal practice, an appraiser must not perform as an advocate for any party or issue."  USPAP Ethics Rule.  USPAP rules also provide that "[a]n appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."  *Id.*

46.    The USPAP also requires that an appraiser communicate the result of an appraisal in a manner "that is not misleading."  The purpose of this rule is to ensure that "the client and any intended users whose expected reliance on an appraisal may be affected by the extent of the appraiser's investigation are properly informed and are not misled as to the scope of work."  *Id.*  In this regard, the appraiser's "scope of work" must include the research and analyses necessary to develop credible assignment results.  To that end, an appraiser must not "exclude any information or procedure that would appear to be relevant to the client, an intended user, or the appraiser's peers in the same or a similar result."  *Id.*  Additionally, an appraiser "must not allow assignment conditions or other factors to limit the extent of research or analysis to such a degree that the resulting opinions and conclusions developed in an assignment are not credible in the context of the intended use of the appraisal."  *Id.*

47.    The USPAP further provides that it is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

a.   the reporting of a predetermined result (e.g., opinion of value);

b.   a direction in assignment results that favors the cause of the client;

c.   the amount of a value opinion;

d.   the attainment of a stipulated result; or

e.   the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

48.   In addition, each USPAP appraisal report must contain a certification signed by the appraiser, stating that his or her compensation for completing the assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client. *Id.*

49.   The USPAP standards are incorporated into federal law, 12 C.F.R. § 34.44.  Such law provides that an in-house or staff appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property."  12 C.F.R. § 34.45.  And, for appraisers who are independent contractors or "fee" appraisers, the regulation similarly requires that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction."  12 C.F.R. § 34.45.

50.   Appraisers and appraisals are also regulated by state laws, including California Civil Code Section 1090.5 which provides, in pertinent part, that: "(a) No person with an interest in a real estate transaction involving a valuation shall improperly influence or attempt to improperly influence the development, reporting, result, or review of that valuation, through coercion, extortion, bribery, intimidation, compensation, or instruction."

**B.    Countrywide's Fraudulent Appraisal Scheme**

51.    Commencing in 2003, Countrywide produced hundreds of billions of dollars in loans annually and had a residential mortgage servicing portfolio in excess of $1 trillion.

52.    Countrywide originated mortgages through its retail operations, primarily branded as "Countrywide Home Loans," where Countrywide acted as the loan broker (through Countrywide Home Loans) and the lender (through Countrywide Bank).

53.    As the real estate market grew exponentially during the early 2000's, Countrywide's lending and loan servicing business grew rapidly.  By 2004, Countrywide had become the largest mortgage lender in the United States and, to fuel its appetite for profit, Countrywide began loosening its underwriting efforts to rapidly close and sell loans to the secondary market.  To that end, Countrywide viewed the appraisal process as a speed bump in the road to closing a loan.

54.    From at least 2004 and continuing through at least 2007, Countrywide maintained a database entitled "Field Review List" which contained the names of "independent" appraisers who were blacklisted by Countrywide because they refused to participate in the fraudulent scheme.  And, to further address the "problem" of "independent" appraisers impeding Countrywide's ability to rapidly originate and sell loans, Countrywide targeted and developed an affiliation with LandSafe.  Through LandSafe, Countrywide could (1) use its market size to pressure appraisers to disregard the appraisal "independence" requirements and permit Countrywide to rapidly close a loan; (2) punish appraisers who refused to "play ball;" and (3) use fraudulent appraisal "reviews" to revise legitimate appraisals to arrive at values needed to close a loan.  Indeed, given Countrywide's significant mortgage lending business, LandSafe had a strong financial incentive to play by Countrywide's rules.

55.    On May 13, 2009, a whistleblower named Kyle Lagow ("Lagow"), represented by Hagens Berman, filed a sealed complaint against Countrywide, LandSafe, BofA and others for damages and civil penalties under the False Claims Act

- 12 -

in the United States District Court for the Eastern District of New York.  In May 2012, Lagow's complaint was finally unsealed and Defendants' phony appraisal scheme was exposed.

56.     Lagow's unsealed complaint contains detailed allegations concerning his first-hand knowledge of Defendants' corrupt appraisal conduct.  According to Lagow's unsealed complaint, from June 2004 until November 2008, Lagow was employed by LandSafe, Inc. in Plano, Texas as one of the company's original supervisory home appraisers.  He was promoted to Field Valuation Manager, then Area Manager, and ultimately Assistant Vice President, Area Appraisal Manager.

57.     Lagow's unsealed complaint alleged that during his tenure at LandSafe, he had direct exposure to the false statements, records and/or claims made by LandSafe, its affiliate Countrywide Home Loans, Countrywide Bank and their parent Countrywide Financial.  Lagow witnessed first-hand Defendants' corruption of the appraisal process in a variety of ways, including by: (1) knowingly and fraudulently inflating, and causing inflation of property appraisals on, among others, FHA-backed loans; (2) refusing to supply bona fide appraisers with documents and other materials necessary for appraisals; (3) paying above-market fees to those appraisers who disregarded the appraisal independence requirements in contravention of the law ; (4) rewarding appraisers who produced corrupt appraisals and appraisal reviews at a rate of as many as 400 per month; (5) blacklisting, retaliating against, auditing, and firing appraisers who refused to corrupt their appraisal reports in contravention of the law; (6) requiring appraisers to rely upon information outside the relevant market to justify manipulated valuations in the subject appraisals; (7) providing appraisers with false sales information, not reflecting concessions made by sellers at the time of closing, further corrupting the use of comparables to complete legitimate appraisals; and (8) retaliating against persons who questioned or criticized the pattern and practice of preparing illegitimate appraisals.

58.     According to Lagow's unsealed complaint, LandSafe utilized two distinct appraisal mechanisms.  First, it would assign appraisal requests for Countrywide wholesale or retail loans to either outside "fee" appraisers or its "staff" appraisers. These outside "fee" appraisers were pressured to "play ball" through threats of blacklisting; and the staff appraisers were pressured directly by their employer, LandSafe, to generate a manipulated, illegitimate appraisal, as necessary to close a deal.  Second, it would "review" all appraisals for Countrywide loans ostensibly as a quality control measure.   However, in reality, the "review" mechanism was a sham created by Defendants to: (1) create the illusion of a robust underwriting process to verify property values; (2) allow for rewriting and inflating of any appraisal valuations that, if left undisturbed, would prevent the associated loan from closing; and (3) allow Defendants to market this sham "review" mechanism and thereby mislead investors and regulators into believing its assets were more secure and less in need of oversight than competitor products.

59.     According to Lagow's unsealed complaint, when he started at LandSafe in 2004, he was immediately placed in a supervisory position over a team of staff appraisers whose primary purpose was to perform appraisals on loans originated by Countrywide.  His responsibility was to hire and train new staff appraisers in multiple states and to directly supervise these appraisers in their completion of appraisals on Countrywide loans.  During his tenure at LandSafe, Lagow opened new markets for the company, hiring teams of appraisers to handle Countrywide's loans across Utah, Colorado, Arizona, Louisiana, Texas and Oklahoma.

60.     As a supervising appraiser and ultimately Assistant Vice President and Area Manager, Lagow was involved in many communications between the LandSafe staff appraisers and Countrywide.  He was also directly involved in communications between Countrywide loan originators, through LandSafe, to fee appraisers.  In addition, Lagow was given a supervisory position over so-called review appraisers.

61.     According to Lagow's unsealed complaint, early in his tenure at LandSafe, he personally observed Countrywide and LandSafe's manipulation of the appraisal process, a manipulation intended to help fill the mortgage origination pipeline.  For example, in early 2005, Lagow attended a meeting with LandSafe President Todd Baur and a group of other appraisal managers.  Baur told the appraisal managers, including Mr. Lagow that: (1) that they needed to quit thinking of an appraisal as a separate unit; (2) LandSafe appraisers were there to help facilitate a Countrywide loan closing; and (3) they needed to change their thought process, the clear implication being that they needed to stop thinking like appraisers and think instead like lenders trying to close a loan.  Lagow and his colleagues came to understand from Baur that the appraisal manager's job at LandSafe was to make sure that appraisals did not derail Countrywide's loans.

62.     By early 2006, Lagow had identified that Countrywide and LandSafe were exerting control over the home valuation process which resulted in manipulated appraisals which, in turn, led to routinely inflated mortgages with actual loan-to-value ratios as high as 115%-far above the 97% permitted by the FHA insurance program-which in turn was leading to increased foreclosures.

63.     According to Lagow, just prior to his termination in late 2008, he learned of a formal internal audit of LandSafe's fraudulent appraisal practice conducted by a Senior Vice President at LandSafe.  The audit found that the appraisals conducted by LandSafe were pre-textual, and the appraisal reports *always* communicated an inflated value necessary for Countrywide to close a loan.  Despite these audit results, LandSafe continued its uniform practice of systematically preparing and charging for illegitimate appraisals at Countrywide's request.

64.     Because Countrywide controlled the appraisal process through exclusive use of complicit LandSafe employees, Countrywide was able to inflate and control the home sales prices and/or direct appraisals to be performed with indifference to the appraisals' accuracy.

65.     Forcing buyers to use Landsafe as the appraiser was essential as another lending institution might use a truly independent appraiser who in turn would unravel the appraisal scheme by performing an accurate appraisal, which may have provided an appraised value which was below the contract value.

**C.     Defendants Defraud Plaintiffs**

**1.     Plaintiff Elizabeth Williams**

66.     On or about February 27, 2007, Elizabeth Williams applied for a loan with Countrywide-KB, in connection with the purchase of a home in Richmond, California.  Ms. Williams dealt with KB Countrywide Loan Consultant Roxanne McDonald, though Ms. Williams also received communications from McDonald's colleagues and/or staff who did not identify themselves by name.  Plaintiffs are informed and believe that as part of Defendants' uniform practice of systematically corrupting the appraisal process in connection with loans originated by Countrywide, McDonald's colleagues were authorized by Countrywide to provide Ms. Williams with loan-related documents, including a loan application, Disclosure Statements, Good Faith Estimates, HUD-1 Settlement Statements, appraisals, and other loan-related documents, which contained the misrepresentations and omissions at issue in this case.

67.     In most instances, the documents Ms. Williams received were standard form statements or agreements which were prepared on Countrywide or LandSafe's letterhead and stationary, and which contained their official corporate logos.  However, many of the standard form agreements were not physically signed by a Countrywide or LandSafe representative, making it impossible for Ms. Williams to identify the specific corporate representative who sent such documents.  Nevertheless, the representations and omissions that are the subject of this case were made by Countrywide and LandSafe through agents who were authorized to act on their behalf.  In this regard, Plaintiffs have identified below the names of the Countrywide and

LandSafe loan officers and appraisers with whom Ms. Williams had dealings, and who provided her with the official business records that are the subject of this case.

68.     Countrywide Ventures and Countrywide-KB were federally-insured and federally-regulated financial institutions and, as such, were required to obtain a USPAP appraisal in connection with Ms. Williams' loan transaction.  However, Countrywide Ventures and Countrywide-KB were not themselves prepared to pay the cost of obtaining this legally-mandated appraisal.  In that regard, in connection with Defendants' unlawful practices, on or about March 2, 2007, McDonald, on behalf of Countrywide Ventures and Countrywide-KB, provided Ms.  Williams with certain loan-related documents, including certain Disclosure Statements, Good Faith Estimates, and HUD-1 Settlement Statements, which represented to Ms. Williams that "Lender may require *you* to use the services of an affiliated . . . real estate appraiser, *as a condition of your loan on this property*, to represent the Lender's interests in the transaction." (emphasis added.)  The Good Faith Estimate informed Ms. Williams that she would be required to use Landsafe Appraisal Services, Inc.

69.     To that end, as part of Defendants' uniform scheme to unlawfully charge homeowners like Ms. Williams for appraisal reports which were generated without regard for the appraisal's accuracy and instead provided values which were intended to facilitate the closing of Countrywide loans, in the loan-related documents provided to Ms. Williams, Countrywide Ventures and Countrywide-KB, informed Ms. Williams that LandSafe Appraisal Services, Inc. was its sole appraisal provider and that *Ms. Williams* would be charged an estimated sum of $200-$450 for this legally-mandated USPAP appraisal.

70.     However, Defendants materially omitted and failed to disclose why Ms. Williams would be required to use LandSafe's services.  Defendants never mentioned that Countrywide was indifferent to the appraisal's accuracy and instead, the purpose was to create pre-textual appraisals in order to streamline Defendants' mortgage

business and close loans faster rather than to provide an honest assessment of Ms. Williams's property value.

71.     On or about March 2, 2007, in accordance with its uniform practice of passing on the cost of the legally-mandated USPAP appraisal to borrowers, McDonald, or her colleagues provided Ms. Williams with loan-related documents in which Countrywide Ventures and Countrywide-KB represented to Ms. Williams that, in connection with the closing of her loan, she would incur the sum of $450.00 for the required "appraisal" performed by LandSafe.

72.     On or about March 21, 2007, Ms. Williams emailed KB Home sales representative Duc Hoang about McDonald's failure to properly process her loan application.  Between March and August of 2007, Ms. Williams communicated with Countrywide officers Cynthia Luongo and James Hecht among others to repair errors in her loan file.

73.     During this time frame between March and August of 2007, in furtherance of Defendants' unlawful appraisal scheme, Plaintiffs are informed and believe that LandSafe, through its agents, prepared a document for Ms. Williams entitled "Uniform Residential Appraisal Report" on Ms. Williams' property which falsely represented that it had been prepared "in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP) as approved by the Appraisal Standards Board of the Appraisal Foundation; the requirements to Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989 (FIRREA); the Uniform Standards of Professional Appraisal Practice and the Code of Professional Ethics of the Appraisal Institute; all applicable state licensing and certification requirements; and all applicable Supplemental Standards." (hereafter the "Williams Appraisal").  Plaintiffs are informed and believe that LandSafe, through its agents and as part of Defendants' scheme, made representations and omissions contained in the Williams Appraisal.

74.    Plaintiffs are informed and believe that in connection with the scheme, LandSafe, from its offices in Plano, Texas, sent, via U.S. Mail or an interstate carrier such as Federal Express, the Williams Appraisal to Countrywide Ventures and Countrywide KB Home Loans offices in California.  Plaintiffs are informed and believe that Defendants *never* transmitted the Williams Appraisal directly to Ms. Williams.

75.    In furtherance of Defendants' uniform scheme to unlawfully charge homeowners like Ms. Williams for appraisal reports which were generated without regard for the appraisal's accuracy and instead provided values which were intended to facilitate the closing of Countrywide loans, neither Countrywide Financial, Countrywide Home Loans, Countrywide Ventures, Countrywide-KB, Countrywide Bank nor LandSafe, nor their agents identified above, disclosed to Ms. Williams that the Williams Appraisal was not prepared according to USPAP standards, regulations and laws governing appraisals and, thus, was illegitimate and violated Title XI, FIRREA, FHA requirements, and state law, among others.  Instead, they concealed their fraudulent appraisal scheme.

76.    In reliance on the above misrepresentations and concealments by Countrywide Financial, Countrywide Home Loans, Countrywide Bank and LandSafe, Ms. Williams paid the subject "appraisal" fee of $515 for the legally-mandated Williams Appraisal.  Had Ms. Williams known that Countrywide was indifferent to the Williams Appraisal's accuracy, or that the Williams Appraisal was pre-textual rather than prepared according to USPAP standards, regulations and laws governing appraisals, Ms. Williams would not have paid LandSafe the $515 to perform the Williams Appraisal.

77.    Plaintiffs are informed and believe that Countrywide and LandSafe shared some portion of the fee that Ms. Williams paid for the Williams Appraisal.

1

### 2.     Plaintiff Beckie Reaster

2

78.     On or about June 2, 2006, Beckie Reaster applied for a loan with

3

Countrywide-KB, in connection with the purchase of a home in New Smyrna, Florida.

4

Ms. Reaster dealt with Countrywide home loan counselor Blair Hogue, though Ms.

5

Reaster also received communications from Hogue's colleagues and/or staff who did

6

not identify themselves by name.  Plaintiffs are informed and believe that as part of

7

Defendants' uniform practice of systematically corrupting the appraisal process in

8

connection with loans originated by Countrywide, Hogue's colleagues were

9

authorized by Countrywide to provide Ms. Reaster with loan-related documents,

10

including a loan application, Disclosure Statements, Good Faith Estimates, HUD-1

11

Settlement Statements, appraisals, and other loan-related documents, which contained

12

the misrepresentations and omissions at issue in this case.

13

79.     In most instances, the documents Ms. Reaster received were standard

14

form statements or agreements which were prepared on Countrywide or LandSafe's

15

letterhead and stationary, and which contained their official corporate logos.

16

However, many of the standard form agreements were not physically signed by a

17

Countrywide or LandSafe representative, making it impossible for Plaintiffs to

18

identify the specific corporate representative who sent such documents.  Nevertheless,

19

the representations and omissions that are the subject of this case were made by

20

Countrywide and LandSafe through agents who were authorized to act on their behalf.

21

In this regard, Plaintiffs have identified below the names of the Countrywide and

22

LandSafe loan officers and appraisers with whom she had dealings, and who provided

23

her with the official business records that are the subject of this case.

24

80.     Again, Countrywide Ventures and Countrywide-KB were federally

25

insured and federally regulated financial institutions and, as such, were required to

26

obtain a USPAP appraisal in connection with Ms. Reaster's loan transaction.

27

However, Countrywide Ventures and Countrywide-KB were not themselves prepared

28

to pay the cost of obtaining this legally-mandated appraisal.  In that regard, in

connection with Defendants' unlawful practices, in early June 2006, Hogue, on behalf of Countrywide Ventures and Countrywide-KB, provided Ms. Reaster with certain loan-related documents, including certain Disclosure Statements, Good Faith Estimates, and HUD-1 Settlement Statements, which represented to Ms. Reaster that "Lender may require *you* to use the services of an affiliated . . . real estate appraiser, *as a condition of your loan on this property*, to represent the Lender's interests in the transaction." (emphasis added.)  The Good Faith Estimate informed Ms. Reaster that she would be required to use Landsafe Appraisal Services, Inc.

81.   To that end, as part of Defendants' uniform scheme to unlawfully charge homeowners like Ms. Reaster for appraisal reports which were generated without regard for the appraisal's accuracy and instead provided values which were intended to facilitate the closing of Countrywide loans, in the loan-related documents provided to Reaster, Countrywide Ventures and Countrywide-KB, informed Ms. Reaster that LandSafe Appraisal Services, Inc. was its sole appraisal provider and that *Ms. Reaster* would be charged an estimated sum of $200-$450 for this legally-mandated USPAP appraisal.

82.   However, Defendants materially omitted and failed to disclose why Ms. Reaster would be required to use LandSafe's services.  Defendants never mentioned that Countrywide was indifferent to the appraisal's accuracy and instead, the purpose was to create pre-textual appraisals in order to streamline Defendants' mortgage business and close loans faster rather than to provide an honest assessment of Reaster's property value.

83.   On or about June 5, 2006, in accordance with its uniform practice of passing on the cost of the legally-mandated USPAP appraisal to borrowers, Hogue or his colleagues provided Ms. Reaster with loan-related documents in which Countrywide Ventures and Countrywide-KB represented to Plaintiffs that, in connection with the closing of her loan, she would incur the sum of $350.00 for the required "appraisal" performed by LandSafe.

84.    On or about June 16, 2006, Ms. Reaster received notice from Countrywide Ventures and Countrywide-KB that she had been approved for a home purchase loan.  Approval was subject to a series of itemized requirements which had to be satisfied prior to closing including attaining a "Satisfactory Property Appraisal supporting sales price" and a "Satisfactory Desk Review of appraisal."  The approval letter was signed by Christian Kuethe, Branch Manager, Countrywide KB Home Loans.

85.    On or about November 21, 2006, in furtherance of Defendants' unlawful appraisal scheme, LandSafe, through its agents, including Steven M. Miller of A+ Appraisal Services, LLC, prepared a document for Plaintiff entitled "Uniform Residential Appraisal Report" on Plaintiff's property which falsely represented that it had been prepared "in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP) as approved by the Appraisal Standards Board of the Appraisal Foundation; the requirements to Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989 (FIRREA); the Uniform Standards of Professional Appraisal Practice and the Code of Professional Ethics of the Appraisal Institute; all applicable state licensing and certification requirements; and all applicable Supplemental Standards." (hereafter the "Reaster Appraisal").  Plaintiffs are informed and believe that Miller and A+ Appraisal Services, LLC were authorized by LandSafe, as part of Defendants' scheme, to make the representations and omissions contained in the Reaster Appraisal.

86.    Plaintiffs are informed and believes that in connection with the scheme, LandSafe, from its offices in Plano, Texas, sent, via U.S. Mail or an interstate carrier such as Federal Express, the Reaster Appraisal to Countrywide Ventures and Countrywide-KB, and Countrywide Ventures and Countrywide-KB then transmitted the Reaster Appraisal, via U.S. Mail or an interstate carrier such as Federal Express, to Ms. Reaster.  Plaintiffs are informed and believe that LandSafe also transmitted the

Reaster Appraisal directly to Ms. Reaster via U.S. Mail or an interstate carrier such as Federal Express.

87.     In furtherance of Defendants' uniform scheme to unlawfully charge homeowners like Ms. Reaster for appraisal reports which were generated without regard for the appraisal's accuracy and instead provided values which were intended to facilitate the closing of Countrywide loans, neither Countrywide Financial, Countrywide Home Loans, Countrywide Ventures, Countrywide-KB, Countrywide Bank nor LandSafe, nor their agents identified above, disclosed to Ms. Reaster that the Reaster Appraisal was not prepared according to USPAP standards, regulations and laws governing appraisals and, thus, was illegitimate and violated Title XI, FIRREA, FHA requirements, and state law, among others.  Instead, they concealed their fraudulent appraisal scheme.

88.     In reliance on the above misrepresentations and concealments by Countrywide Financial, Countrywide Home Loans, Countrywide Bank and LandSafe, Reaster paid the subject "appraisal" fee of $400 for the legally-mandated 2006 Appraisal.  Had Ms. Reaster known that Countrywide was indifferent to the Reaster Appraisal's accuracy, or that the Reaster Appraisal was pre-textual rather than prepared according to USPAP standards, regulations and laws governing appraisals, Ms. Reaster would not have paid LandSafe the $400 to perform the Reaster Appraisal.

89.     Plaintiffs are informed and believe that Countrywide and LandSafe shared some portion of the fee that Plaintiffs paid for the Reaster Appraisal.

**3.     Plaintiff Rebecca Murphy**

90.     In or about December 2006, Rebecca Murphy applied for a loan with Countrywide Ventures and Countrywide-KB in connection with the purchase of a home in New Smyrna Beach, Florida.  Ms. Murphy dealt primarily with the Countrywide KB Home Loans location at 2300 Maitland Center Parkway #220, Maitland, Florida.  Ms. Murphy also received communications at this office from individuals including Felix Santana and other staff who did not identify themselves by

name.  Plaintiffs are informed and believe that as part of Defendants' uniform practice of systematically corrupting the appraisal process in connection with loans originated by Countrywide, Countrywide KB Home Loans staff at 2300 Maitland Center Parkway #220, Maitland, Florida were authorized by Countrywide to provide Plaintiffs with loan-related documents, including a loan application, Disclosure Statements, Good Faith Estimates, HUD-1 Settlement Statements, appraisals, and other loan-related documents, which contained the misrepresentations and omissions at issue in this case.

91.    In most instances, the documents Ms. Murphy received were standard form statements or agreements which were prepared on Countrywide or LandSafe's letterhead and stationary, and which contained their official corporate logos. However, many of the standard form agreements were not physically signed by a Countrywide or LandSafe representative, making it impossible for Plaintiffs to identify the specific corporate representative who sent such documents.  Nevertheless, the representations and omissions that are the subject of this case were made by Countrywide and LandSafe through agents who were authorized to act on their behalf. In this regard, Plaintiffs have identified below the names of the Countrywide and LandSafe loan officers and appraisers with whom she had dealings, and who provided her with the official business records that are the subject of this case.

92.    Once again, Countrywide Ventures and Countrywide-KB were federally-insured and federally-regulated financial institutions and, as such, were required to obtain a USPAP appraisal in connection with Ms. Murphy's loan transaction. However, Countrywide Ventures and Countrywide-KB were not themselves prepared to pay the cost of obtaining this legally-mandated appraisal.  In that regard, in connection with Defendants' unlawful practices, in early 2007, Ms. Murphy received certain loan-related documents from Countrywide Ventures and Countrywide-KB, including certain Disclosure Statements, Good Faith Estimates, and HUD-1 Settlement Statements which represented to Ms. Murphy that "Lender may require *you* to use the

services of an affiliated . . . real estate appraiser, *as a condition of your loan on this property*, to represent the Lender's interests in the transaction." (emphasis added.) The Good Faith Estimate informed Ms. Murphy that she would be required to use Landsafe Appraisal Services, Inc.

93.    To that end, as part of Defendants' uniform scheme to unlawfully charge homeowners like Ms. Murphy for appraisal reports which were generated without regard for the appraisal's accuracy and instead provided values which were intended to facilitate the closing of Countrywide loans, in the loan-related documents provided to Ms. Murphy, Countrywide Ventures and Countrywide-KB informed Plaintiff that LandSafe Appraisal Services, Inc. was its sole appraisal provider and that *Ms. Murphy* would be charged an estimated sum of $200-$450 for this legally-mandated USPAP appraisal.

94.    However, Defendants materially omitted and failed to disclose why Ms. Murphy would be required to use the services of Defendants' selected appraiser. Defendants never mentioned that Countrywide was indifferent to the appraisal's accuracy and instead, the purpose was to create pre-textual appraisals in order to streamline Defendants' mortgage business and close loans faster rather than to provide an honest assessment of Ms. Murphy's property value.

95.    On or about July 25, 2007, LandSafe, through its agents, including Paul A. Rioux of Halifax Appraisal Company, prepared a document for Ms. Murphy entitled "Uniform Residential Appraisal Report" on Ms. Murphy's property which falsely represented that it had been prepared "in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of the Appraisal Foundation." (hereafter the "Murphy  Appraisal").  Plaintiffs are informed and believe that Rioux was authorized by LandSafe, as part of the scheme, to make the representations and omissions contained in the Murphy Appraisal.

96.     Plaintiffs are informed and believe that in connection with the scheme, LandSafe, though its agents identified above, from its offices in Plano, Texas sent, via U.S. Mail or an interstate carrier such as Federal Express, the Murphy Appraisal to Countrywide Ventures and Countrywide-KB.  Indeed, an Order Form for the Murphy Appraisal identifies the "client" collectively as "Countrywide KB Home Loans/LandSafe App in Maitland, Florida and with a billing address for LandSafe Appraisal Service in Simi Valley, California.  Plaintiffs are informed and believe that Countrywide Ventures and Countrywide-KB then transmitted, via U.S. Mail or an interstate carrier such as Federal Express, the Murphy Appraisal to Ms. Murphy. Plaintiffs are informed and believe that LandSafe also transmitted the Murphy Appraisal directly to Plaintiff via U.S. Mail or an interstate carrier such as Federal Express.

97.     On or about September 11, 2007, Countrywide Home Loans represented to Plaintiffs, as it did to other members of the Class (as defined below), that LandSafe had performed a Uniform Residential Appraisal Report of Ms. Murphy's home, and, in connection with the consummation of Ms. Murphy's financing transaction, Countrywide Home Loans represented to Ms. Murphy that she would be charged an "appraisal" fee of $410.00 for the legally-mandated Murphy Appraisal.

98.     Had Ms. Murphy known Countrywide was indifferent to the Murphy Appraisal's accuracy, or that the Murphy Appraisal was pre-textual rather than prepared according to USPAP standards, regulations and laws governing appraisals, Murphy would not have paid LandSafe the $410 fee to perform the Murphy Appraisal.

99.     On or about September 17, 2007, Ms. Murphy executed a Note with Countrywide-KB Home Loans for a loan.

100.    Neither Countrywide Financial, Countrywide Home Loans, that Countrywide Ventures and Countrywide-KB, Countrywide Bank nor LandSafe, nor their agents identified above, disclosed to Ms. Murphy that Countrywide was indifferent to the Murphy Appraisal's accuracy, or that the Murphy Appraisal was not

prepared according to uniform standards, regulations and laws governing appraisals and was not an independent and objective valuation of the property, and, thus, was illegitimate and violated Title XI, FIRREA, FHA requirements, and state law, among others.  Instead, they concealed their fraudulent scheme to manipulate and inflate her appraisal.

101.   In reliance on the above misrepresentations and concealments by Countrywide Financial, Countrywide Home Loans, Countrywide Ventures and Countrywide-KB, Countrywide Bank and LandSafe, Ms. Murphy paid the subject "appraisal" fee for the Murphy Appraisal.

102.   Plaintiffs are informed and believe that Countrywide and LandSafe shared some portion of the fee that Ms. Murphy paid for the Murphy Appraisal.

103.   Plaintiffs are informed and believe that the Williams Appraisal, the Reaster Appraisal, and the Murphy Appraisal were illegitimate, unsupported and violated USPAP, Title XI, FIRREA, FHA requirements, and state law, among others, because they were conducted pursuant to Defendants' above-described uniform practice of engaging in systematic, unlawful conduct with respect to the preparation of all appraisals for Countrywide loans during the period 2004 to 2008, which was designed to ensure that appraisal reports contained an inflated or manipulated property "value" which always exceeded the Countrywide loan amount, regardless of the true value of the property.

104.   Thus, the appraisal reports Plaintiffs received not only falsely stated that they were USPAP appraisals; in fact, they were not "appraisals" at all.  In that regard, through their uniform practice of systematically corrupting the appraisal process in connection with loans originated by Countrywide, Defendants produced so-called "appraisal reports" which were *not* legitimate opinions of the value of Plaintiffs' property.  Rather, they were reports of a predetermined value that favored Countrywide's cause of rapidly closing loans.

### V.    TOLLING OF THE STATUE OF LIMITATIONS

105.   Plaintiffs' claims are subject to both equitable estoppel, stemming from Defendants knowingly and fraudulently concealing the facts alleged herein, and equitable tolling, stemming from Plaintiffs inability to obtain vital information underlying their claims, and *American Pipe* Tolling.  Defendants are estopped from relying upon a statute of limitations defense because they purposefully concealed the fraudulent nature of the inflated appraisals, inflated appraisal fees and their predatory lending practices.  Separate and apart from Defendants' acts of concealment, any applicable statutes of limitation are properly tolled because Plaintiffs did not know and could not have learned the true facts underlying their claims until shortly before filing their Complaint.

#### A.    Equitable Estoppel

106.   Defendants are estopped by their own fraudulent concealment from asserting the statute of limitations as an affirmative defense against Plaintiffs' claims.

107.   Defendants concealed that they were using pre-textual or fraudulently inflated appraisals to facilitate the closing of Countrywide loans.  Defendants affirmatively sought to prevent appraisers from intentionally, or even inadvertently disclosing to borrowers the true rates that they were charging for appraisals so that Defendants could maintain and continue their fraudulent practice of marking-up these charges for no legitimated additional services rendered.

108.   Plaintiffs and the Class members reasonably relied on Defendants' fiduciary and agency obligations to retain appraisers who would provide accurate or not fraudulently inflated appraisals.  Plaintiffs and the Class members reasonably relied on Defendants' fiduciary and agency obligations to charge only that fee for appraisals that represented that actual charge that the appraiser charged and collected from Defendants for each such appraisal.

109.   Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein, including

their affiliated nature, their receipt of unearned settlement service fees for no services rendered, and the pre-textual nature of the appraisals.

110.   The purposes of the statutes of limitations period are satisfied because Defendants cannot claim prejudice due to a late filing where Plaintiffs filed suit promptly upon discovering the facts essential to their claims, described herein, which Defendants knowingly concealed.

**B.     Equitable and *American Pipe* Tolling**

111.   Since at least 2003 and through 2008, Defendants continually and secretly engaged in their phony appraisal scheme.  Only Defendants and their agents knew or could have known about Defendants' corrupt appraisal conduct since Defendants made deliberate efforts to conceal their fraudulent appraisals.  On May 13, 2009, when Lagow filed a whistleblower claim, the complaint was sealed.  Therefore, the public was precluded from learning about Defendants' dishonest conduct.  Only in May, 2012 when Lagow's complaint was finally unsealed was the Defendants' phony appraisal scheme exposed.

112.   Moreover, on November 27, 2013, a similar class action as this matter, *Waldrup v. Countrywide Financial Corp., et al.* No. 08-cv-00214 ("Waldrup Complaint"), was timely filed in this District.  In its Third Amended Complaint, Plaintiff in that matter has identified the same Defendants and the proposed nationwide class in this matter is identical as the proposed class in the Waldrup Complaint.  (See Dkt. #46, ¶83).  Thus, pursuant to *American Pipe and Construction Co., et. al. v. State of Utah, et. al.*,[1] the filing of the Waldrup Complaint suspended the running of the limitations period.  Thus, this action is timely filed.

113.   Plaintiffs and members of the Classes were or have been unable to obtain vital information bearing on their claims absent any fault or lack of diligence on their part.  As further set forth below, Plaintiffs were not on inquiry notice of Defendants'

---

[1] 414 U.S. 538 (1974).

wrongdoing and had no duty to initiate an investigation of any nature because the charges on their HUD-1 Settlement Statements appeared to be legitimate. Plaintiffs did not have any reason to know of the Countrywide's criminal conduct, the RESPA and RICO violations or injuries described herein and did not and could not have known of Defendants' violations of their fiduciary and agency duties, breaches of their contracts or unjust enrichment.

114. Plaintiffs were relieved of any duty to investigate because they reasonably and justifiably relied on Defendants to fulfill their fiduciary and agency duties. Even assuming there had been some indication of wrongdoing (which there was not), and Plaintiffs had attempted to investigate, such investigation would have been futile because it would not have uncovered the true, unlawful nature of Defendants' criminal enterprise and profiteering schemes alleged herein.

115. Plaintiffs and members of the Classes did not discover and could not have discovered, despite all due diligence, that: (1) that their appraisals were pre-textual and fraudulently completed; and (2) that LandSafe was marking up the fees for their appraisals for no additional services rendered. Plaintiffs and members of the Classes did not discover and could not have discovered, despite all due diligence, the schemes alleged herein. Plaintiffs' claims were thus equitably tolled until they discovered the true facts underlying their claims shortly before the filing of the Complaint.

## VI. CLASS ACTION ALLEGATIONS

116. Plaintiffs bring this action, on behalf of themselves, and all others similarly situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

117. Plaintiffs seek to represent the following class and subclasses (collectively, the "Classes") defined as follows:

### The Nationwide Class

All residents of the United States of America who, during the period January 1, 2003 through December 31, 2008,

obtained an appraisal from LandSafe  in connection with a loan originated by Countrywide.

**The California Subclass**

All residents in the state of California who, during the period January 1, 2003 through December 31, 2008, obtained an appraisal from LandSafe in connection with a loan originated by Countrywide.

**The Florida Subclass**

All residents in the state of Florida who, during the period January 1, 2003 through December 31, 2008, obtained an appraisal from LandSafe in connection with a loan originated by Countrywide.

118.   Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveals that the Classes should be expanded or otherwise modified.

119.   Plaintiffs reserve the right to establish subclasses as appropriate.

120.   This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Classes.

121.   <u>Numerosity</u>:  While the exact number of members of the Classes is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Classes is ascertainable based upon the records maintained by Defendants.  At this time, Plaintiffs are informed and believe that the Classes include hundreds of thousands of members.  Therefore, the Classes are sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

122.   <u>Ascertainability</u>:  Some names and addresses of members of the Classes are available from Defendants' records, and others can be ascertained through appropriate notice.  Notice can be provided to the members of the Classes through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

123.   <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the other members of the Class which she seeks to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs and each member of the Classes have been subjected to the same deceptive and improper practices and has been damaged in the same manner thereby.

124.   <u>Adequacy</u>:  Plaintiffs will fairly and adequately represent and protect the interests of the Classes as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Classes, because they have no interests which are adverse to the interests of the members of the Classes.  Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

125.   <u>Superiority</u>: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

      a.      The expense and burden of individual litigation make it economically unfeasible for members of the Classes to seek to redress their claims other than through the procedure of a class action.

      b.      If separate actions were brought by individual members of the Classes, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

c.    Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

126.   Common questions of law and fact exist as to the members of the Classes, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

127.   The common questions of fact include, but are not limited to, the following:

a.    Whether Defendants engaged in unlawful, unfair, misleading, or deceptive business acts or practices in violation of California Business & Professions Code sections 17200 *et seq.*;

b.    Whether Defendants engaged in a pattern or practice of racketeering, as alleged herein;

c.    Whether Defendants were members of, or participants in the conspiracy alleged herein;

d.    Whether Plaintiffs and members of the class sustained damages, and if so, the appropriate measure of damages; and

e.    Whether Plaintiffs and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

128.   In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

a.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes which would establish incompatible standards of conduct for Defendants;

b.    The prosecution of separate actions by individual members of the Classes would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Classes not parties to the

adjudications, or substantially impair or impede their
ability to protect their interests; and

c.   Defendants have acted or refused to act on grounds
generally applicable to the Classes, thereby making
appropriate final injunctive relief or corresponding
declaratory relief with respect to the Class as a whole
and necessitating that any such relief be extended to
members of the Classes on a mandatory, class-wide
basis.

129.   Plaintiffs are not aware of any difficulty which will be encountered in the
management of this litigation which should preclude its maintenance as a class action.

**FIRST CLAIM FOR RELIEF
VIOLATIONS OF THE RACKETEER INFLUENCED
AND CORRUPT ORGANIZATIONS ACT
(18 U.S.C. § 1962(C))**

130.   Plaintiffs incorporate by reference in this claim for relief each and every
allegation of the preceding paragraphs, with the same force and effect as though fully
set forth herein.

131.   Plaintiffs bring this cause of action on behalf of themselves and the
members of the Nationwide Class.

**A.     The Rico Enterprise**

132.   Countrywide Financial, Countrywide Home Loans, Countrywide
Ventures, Countrywide-KB, Countrywide Bank, LandSafe and BofA are each persons
within the meaning of Title 18 United States Code section 1961(3).

133.   At all relevant times, in violation of Title 18 United States Code section
1962(c), KB Home, Countrywide Financial, Countrywide Home Loans, Countrywide
Ventures, Countrywide-KB, Countrywide Bank, LandSafe, and BofA, including their
directors, employees, and agents, conducted the affairs of an association-in-fact
enterprise, as that term is defined in Title 18 United States Code section 1961(4) (the
"Countrywide Enterprise").  The affairs of the Countrywide Enterprise affected
interstate commerce through a pattern of racketeering activity.

134.   The Countrywide Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of generating the fraudulent and phony appraisals of the real property at issue in this case.

135.   While the members of the Countrywide Enterprise participated in and are part of the enterprise, they also have an existence separate and distinct from the enterprise.  The Countrywide Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Countrywide and the persons and/or entities procuring and preparing the fraudulent appraisals.

136.   Operating the Countrywide Enterprise according to policies and procedures developed and established by its executives, Countrywide controlled and directed the affairs of the Countrywide Enterprise and used the other members of the Countrywide Enterprise as instrumentalities to carry out the fraudulent scheme to fraudulently, systematically and uniformly produce and charge borrowers for phony "appraisals" of properties in connection with home loans originated by Countrywide. These policies and procedures established by Countrywide and LandSafe's executives include refusing to utilize bona fide appraisers; paying above-market fees to those appraisers who disregarded the appraisal "independence" requirements and manipulated the market values of subject properties; rewarding appraisers who produced manipulated appraisals; blacklisting, retaliating against, and firing appraisers who refused to engage in such corrupt conduct; requiring appraisers to rely upon information outside the relevant market to justify manipulated valuations in appraisals; and providing appraisers with false sales information and comparables to ensure the production of inflated appraisals.

**B.     The Predicate Acts**

137.   The Countrywide Enterprise's scheme to fraudulently, systematically and uniformly produce and charge borrowers for phony, manipulated or inflated "appraisals" of properties, which were performed with indifference towards the

appraisals' accuracy, in connection with home loans originated by Countrywide was facilitated by the use of the United States Mail and wire. Indeed, the Defendants used the United States Mail (including the use of interstate carriers such as Federal Express) and the wires to submit representations concerning the manipulated appraisals, used the United States Mail and the wires to submit the so-called "appraisals" to Plaintiffs and members of the class, and used the United States Mail and the wires to submit invoices for the so-called "appraisals." The scheme constitutes "racketeering activity" within the meaning of Title 18 United States Code section 1961(1), as acts of mail and wire fraud, under Title 18 United States Code sections 1341 and 1343.

138. In violation of Title 18 United States Code sections 1341 and 1343, the Countrywide Enterprise utilized the mail and wire in furtherance of their scheme to defraud borrowers by obtaining money from them, in the form of payments for the so-called appraisals, using false or fraudulent pretenses.

139. 18 U.S.C. § 1343, the wire fraud statute invoked by 18 U.S.C. § 1961(1) as a predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice …"

140. Between March and August, 2007, LandSafe, though its agents identified above, transmitted the pre-textual Williams Appraisal via U.S. mail or similar carrier such as Federal Express to Landsafe's offices in Plano, Texas. Plaintiffs are informed and believe that in connection with the scheme, from its offices in Plano, Texas sent, via U.S. Mail or an interstate carrier such as Federal Express, Landsafe transmitted the pre-textual Williams Appraisal to Countrywide. In violation of their disclosure obligations, Plaintiffs are informed and believe that Defendants *never* transmitted the pre-textual Williams Appraisal to Ms. Williams.

141.   On or about August 28, 2007, Defendants transmitted the HUD-1 Settlement Statement via U.S. mail or similar carrier such as Federal Express to Ms. Williams which itemized the $515 appraisal fee for the pre-textual Murphy Appraisal.

142.   On or about December 6, 2006, LandSafe, though its agents identified above, transmitted the pre-textual Reaster Appraisal via U.S. mail or similar carrier such as Federal Express to Landsafe's offices in Plano, Texas.  Plaintiffs are informed and believe that in connection with the scheme, from its offices in Plano, Texas sent, via U.S. Mail or an interstate carrier such as Federal Express, Landsafe transmitted the pre-textual Reaster Appraisal to Countrywide.  Plaintiffs are informed and believe that Countrywide Ventures and Countrywide-KB then transmitted, via U.S. Mail or an interstate carrier such as Federal Express, the pre-textual Reaster Appraisal to Ms. Reaster.  Plaintiffs are informed and believe that LandSafe also transmitted the pre-textual Reaster Appraisal directly to Plaintiff via U.S. Mail or an interstate carrier such as Federal Express.

143.   On or about February 28, 2007, Defendants transmitted the HUD-1 Settlement Statement via U.S. mail or similar carrier such as Federal Express to Ms. Reaster which itemized the $400 appraisal fee for the pre-textual Reaster Appraisal.

144.   On or about July 25, 2007, LandSafe, though its agents identified above, transmitted the pre-textual Murphy Appraisal via U.S. mail or similar carrier such as Federal Express to Landsafe's offices in Plano, Texas and/or Simi Valley, California and Countrywide's offices in Maitland, Florida.  Plaintiffs are informed and believe that in connection with the scheme, from its offices in Plano, Texas and/or Simi Valley, California sent, via U.S. Mail or an interstate carrier such as Federal Express, Landsafe transmitted the Murphy Appraisal to Countrywide.  Plaintiffs are informed and believe that Countrywide Ventures and Countrywide-KB then transmitted, via U.S. Mail or an interstate carrier such as Federal Express, the Murphy Appraisal to Ms. Murphy.  Plaintiffs are informed and believe that LandSafe also transmitted the

Murphy Appraisal directly to Plaintiff via U.S. Mail or an interstate carrier such as Federal Express.

145.   On or about September 17, 2007, Defendants transmitted the HUD-1 Settlement Statement via U.S. mail or similar carrier such as Federal Express to Ms. Murphy which itemized the $410 appraisal fee for the pre-textual Murphy Appraisal.

146.   The Countrywide Enterprise's collective association and collective action in procuring and preparing fraudulent appraisals constitutes the RICO enterprise. Every member of the Countrywide Enterprise participated in the process of misrepresenting and concealing the fraudulent nature of the purported appraisals, and charging for the so-called appraisals, thereby allowing them to increase their revenues. The Countrywide Enterprise earned millions of dollars in wrongful profits as a result.

147.   In perpetrating the fraudulent scheme, each member of the Countrywide Enterprise directly or indirectly through its corporate structure has designed and implemented a uniform scheme to prepare and charge for the fraudulent appraisals at issue here.  The Countrywide Enterprise's representations and concealments of their ordering, utilization and charging for so-called USPAP "appraisals," of property comprise one common, uniform nearly identical system of procedures used in virtually an identical way every day.

148.   The Countrywide Enterprise has knowingly, intentionally or recklessly engaged in an ongoing pattern of racketeering under 18 U.S.C. § 1962(c) by committing the predicate acts of wire fraud within the meaning of 18 U.S.C. § 1343, by knowingly and intentionally implementing the scheme to misrepresent and conceal their statements about the preparation, use and charging for so-called USPAP "appraisals" of property that was securing their loans, which allowed the Countrywide Enterprise to reap unlawful profits.

149.   By devising the scheme or artifice to defraud consumers as described herein, the Countrywide Enterprise transmitted or caused to be transmitted by means of "wire communication in interstate or foreign commerce,…writings, signs, signals,

[and] pictures," "for the purpose of executing such scheme or artifice," including by: (i) transmitting phony USPAP "appraisals" of the property securing their loans and (ii) transmitting e-mail communications relating to the process of determining, making or transmitting the phony property appraisals.

150.   Plaintiffs are informed and believe that, in addition to the conduct described above, the Countrywide Enterprise used the wires in conjunction with reaching their agreement to make false statements about their use and charging for "appraisals" of the properties at issue here.

151.   Through the racketeering scheme described above, Defendants used the enterprise to improperly increase their profits to the detriment of consumers in different states.

152.   The Countrywide Enterprise organized and implemented the scheme, and ensured it continued uninterrupted by concealing their use and charging for inflated or otherwise manipulated "appraisals" from consumers, including Plaintiffs.

153.   The Countrywide Enterprise knew the scheme would defraud borrowers, yet each member of the Countrywide Enterprise remained a participant despite the fraudulent nature of the enterprise. At any point while the scheme had been in place, any of the participants could have ended the scheme by abandoning the conspiracy and notifying the public and law enforcement authorities of its existence.  Rather than stopping the scheme, however, the members of the Countrywide Enterprise deliberately chose to continue it, to the direct detriment of consumers such as Plaintiffs.  Plaintiffs suffered injury resulting from the pattern of racketeering activity.

154.   Because Plaintiffs unknowingly paid for a fraudulent appraisal, Plaintiffs are direct victims of the Countrywide Enterprise's wrongful and unlawful conduct. Plaintiffs' injuries were direct, proximate, foreseeable and natural consequences of Defendants' conduct.  There are no independent factors that account for Plaintiffs' economic injuries, and the loss of money satisfies RICO's injury requirement.

155.   Plaintiffs, and members of the Class, are entitled to recover treble damages for the injuries they have sustained, according to proof, as well as restitution and costs or suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

156.   As a direct and proximate result of the subject racketeering activities, Plaintiffs and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting the Countrywide Enterprise from further engaging in their unlawful conduct.

157.   Under the provisions of Section 1964(c) of RICO, members of the Countrywide Enterprise are jointly and severally liable to Plaintiffs and Class members for three times the damages that Plaintiffs and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees

## SECOND CLAIM FOR RELIEF
### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, CONSPIRACY TO VIOLATE TITLE 18 UNITED STATES CODE SECTION 1962(C) (18 U.S.C. § 1962(D))

158.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

159.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Nationwide Class.

160.   As set forth above, in violation of Title 18 United States Code section 1962(d), members of the Countrywide Enterprise conspired to violate the provisions of Title 18 United States Code section 1962(c).

161.   As set forth above, Defendants, having directed and controlled the affairs of the Countrywide Enterprise, was aware of the nature and scope of the enterprise's unlawful scheme, and they agreed to participate in it.

162.   As a direct and proximate result, Plaintiffs and the members of the Class have been injured in their business or property by the predicate acts which make up the Countrywide Enterprise's pattern of racketeering activity in that they ordered and charged for manipulated "appraisals."

**THIRD CLAIM FOR RELIEF**
**VIOLATIONS OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT**
**(12 U.S.C. §§ 2607)**

163.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

164.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Nationwide Class.

165.   Plaintiffs and the Class contracted with Defendants for the provision of settlement services in connection with a transaction involving a federally related mortgage loan.

166.   Plaintiffs are informed and believe that Countrywide and LandSafe shared some portion of the fee that Plaintiffs paid for the Reaster, Murphy, and Williams Appraisals.

167.   "The language of Section 8(b) prohibits only the practice of giving or accepting money where no service whatsoever is performed in exchange for that money." *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 554 (9th Cir. 2010).  A service provider violates Section 8(b) by charging a consumer a fee for which it performs no services; a plaintiff need not demonstrate that the service provider split the fee with another party in order to establish a violation of Section 8(b).  *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007).

168.   By charging reconveyance processing fees in real estate transactions in which Countrywide has not performed reconveyance processing, Defendants have engaged in the practice of receiving a portion, split and percentage of a fee for the

- 41 -

rendering of a real estate settlement service other than for services actually performed in violation of 12 U.S.C. § 2607(b).

169.   Under 12 U.S.C. § 2607(d)(2), Plaintiffs and the Class are entitled to statutory damages for Defendants' violations of 12 U.S.C. § 2607 and 24 C.F.R. § 3500.14 in an amount equal to three times the amount of the reconveyance processing fees involved in Defendants' violations.

170.   Under 12 U.S.C. § 2607(d)(5), Plaintiffs and the Class are entitled to the court costs of the action together with reasonable attorney's fees.

### FOURTH CLAIM FOR RELIEF
### VIOLATION OF UNFAIR COMPETITION LAW
### (CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 *et seq.*)

171.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

172.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Nationwide Class.  In the alternative, should the Court not apply California law nationwide, Plaintiff Williams brings this claim as a subclass on behalf of the California Subclass.

173.   California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice."  For the reasons described above, Defendants have engaged in unlawful, unfair, or fraudulent business acts or practices in violation of California Business and Professions Code sections 17200 *et seq*.

174.   Through the scheme, Defendants have (1) directly and indirectly employed a scheme, device and artifice to defraud and mislead borrowers and defraud any person; (2) directly and indirectly engaged in an unfair and deceptive act towards a person; (3) directly and indirectly obtained property by fraud and misrepresentation; and (4) knowingly made published and disseminated false, deceptive and misleading information.

010606-11  878877 V1

175.   On information and belief, the actions and underlying decisions of Defendants, alleged herein emanated from and occurred within the State of California. California law applies to the claims of Plaintiffs and all Class members.  Defendants planned and implemented their wrongful scheme in California and many of the wrongful acts emanated from Countrywide's California offices.  As such, it is appropriate to apply California law nationwide.

176.   Defendants' conduct described herein constitutes an unlawful business practice within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.* in that the conduct violates, among other laws, the Racketeering Influenced and Corrupt Practice Act ("RICO"), the Real Estate Settlement Procedures Act of 1974 ("RESPA"), California Civil Code section 1090.5, and the common law of fraud and unjust enrichment.  Specifically, as alleged herein, Countrywide has:

- Violated 18 U.S.C. § 1962(c) by conducting the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interested commerce through a pattern of racketeering activity, and engaged in a conspiracy in violation of 18 U.S.C. § 1962(d);

- Violated 12 U.S.C.  § 2607(a)-(c), Regulation X, 24 C.F.R. § 3500.14, and 24 C.F.R. § 3500.2 by referring appraisal settlement services business to LandSafe (1) in exchange for control over the appraisal valuation process; and (2) without making the disclosures required by RESPA;

- Violated 12 U.S.C. § 2607(b) and Regulation X, 24 C.F.R. § 3500.14, by charging fees for appraisals that were never properly conducted;

- Violated Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") by influencing, coercing and manipulating the appraisal process;

- Violated the National Housing Act, as amended, by influencing, coercing and manipulating the appraisal process in connection with FHA-backed loans;

- Engaged in acts prohibited by California Civil Code section 1090.5, including: (1) "[s]eeking to influence a person who prepares a valuation to report a minimum or maximum value for the property being valued," Cal. Civ. Code § 1090.5(a)(1); (2) "[w]ithholding or threatening to withhold timely payment to a person or entity that prepares a valuation, or provides valuation management functions, because that person or entity does not return a value at or above a certain amount," *id.* at § 1090.5(a)(2); (3) "[i]mplying to a person who prepares a valuation that current or future retention of that person depends on the amount at which the person estimates the value of the real property," *id.* at § 1090.5(a)(3); (4) "[e]xcluding a person who prepares a valuation from consideration for future engagement because the person reports a value that does not meet or exceed a predetermined threshold," *id.* at § 1090.5(a)(4); and

- Violated the common law governing unjust enrichment by receiving a benefit from Plaintiffs and Class members in the form of appraisal fees, which fees were unearned and unreasonable, not for services actually performed and made in violation of federal and common law.

177. Defendants' conduct as described herein violates not only the "unlawful" prong of the UCL, but also constitutes a violation of the UCL's "unfair" prong. Defendants' conduct offends public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers. Any justification for Defendants' practices is outweighed by the consequences and harm to Plaintiffs and the Class. There were reasonable alternatives available to Defendants to further Defendants' legitimate business interests, other than the conduct described herein.

178. Plaintiffs and members of the Class have suffered injury-in-fact and have lost money or property as a result of Defendants' unlawful, unfair and/or deceptive business practices. Each of Defendants' omissions was material to Plaintiffs and members of the Class in ordering and paying for the fraudulent, manipulated and inflated "appraisals" at issue. By materially omitting and failing to disclose why Plaintiffs were required to use Defendants' selected appraiser, Defendants deliberately

ensured that Plaintiffs were unaware the appraisals they paid for and received were pre-textual and executed in order to streamline Defendants' mortgage business and close loans faster rather than to provide an honest assessment of Plaintiffs' property value.

179.   Plaintiffs and the members of the Class seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

180.   Defendants' conduct was also "fraudulent, misleading, or likely to deceive the public" within the meaning of California Business and Professions Code section 17200.  By engaging in an ongoing enterprise to create pre-textual appraisals, Defendants distorted home values throughout the United States since the valuations created by Defendants' appraisals were determined by Defendants' deceitful business practices rather than underlying economic forces affecting the real estate market.

181.   Had the true nature of the fraudulent, manipulated and inflated appraisals been disclosed to Plaintiffs and Class members, they would not have paid for the appraisals at issue.

182.   Plaintiffs and members of the Class have been injured in fact and suffered a loss of money or property as a result of Defendants' fraudulent, unlawful, and unfair business practices.

183.   Defendants have thus engaged in unlawful, unfair, and fraudulent business acts entitling Plaintiffs and members of the Class to judgment and equitable relief against Defendants, as set forth in the Prayer for Relief.

184.   Additionally, under Business and Professions Code section 17203, Plaintiffs and members of the Class seek an order requiring Defendants to immediately cease such acts of unlawful, unfair, and fraudulent business practices, and requiring Defendants to correct their actions.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT**
**(FLA. STAT. §§ 501.201 *et seq.*)**

(On Behalf of the Florida Subclass)

185.   Plaintiffs Reister and Murphy incorporate by reference each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

186.   In the event that the Court does not apply California law nationwide, Plaintiffs Reister and Murphy bring this cause of action on behalf of themselves and the members of the Florida Subclass.

187.   Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  FLA. STAT. § 501.204(1).

188.   Defendants engaged in a scheme to influence, coerce and manipulate the appraisal process and charge fees for appraisals that were never properly conducted Through the scheme, Defendants have (1) directly and indirectly employed a scheme, device and artifice to defraud and mislead borrowers and defraud any person; (2) directly and indirectly engaged in an unfair and deceptive act towards a person; (3) directly and indirectly obtained property by fraud and misrepresentation; and (4) knowingly made published and disseminated false, deceptive and misleading information.

189.   Accordingly, Defendants have engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in FLA. STAT. § 501.204(1), including representing that the Reaster and Murphy Appraisals have characteristics, uses, benefits, and qualities which they do not have; representing that the Reaster and Murphy Appraisals are of a particular standard and quality when they are not; advertising the Reaster and Murphy Appraisals with the

- 46 -

intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

190.   Defendants' conduct as set forth above occurred in the conduct of trade or commerce

191.   Defendants' conduct proximately caused injuries to Plaintiffs Reaster and Murphy and the other Florida Subclass members.

192.   Plaintiffs Reaster and Murphy and the other Florida Subclass members were injured as a result of Defendants' conduct in that Plaintiffs Reaster and Murphy and the other Florida Subclass members overpaid for their appraisals and did not receive the benefit of their bargain.  These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

**SIXTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

193.   Plaintiffs incorporate by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

194.   Plaintiffs bring this cause of action on behalf of herself and the members of the Nationwide Class, based on a nationwide class application of the laws of California.  If the Court does not apply California law nationwide, Plaintiffs assert a subclass based on the laws of California and Florida.

195.   By their wrongful acts, Defendants were unjustly enriched at the expense of Plaintiffs and members of the Classes.

196.    Defendants knowingly, fraudulently, systematically, and uniformly procured and prepared manipulated and/or inflated appraisals on home loans originated by Countrywide.

197.   Defendants then charged Plaintiffs and members of the Classes between $300 and $600 for phony, manipulated so-called USPAP appraisals, which solely benefitted Defendants.

198.   Thus, Plaintiffs and members of the Classes were unjustly deprived.

199.   It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and misleading conduct alleged herein.

200.   Plaintiffs and members of the Classes seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

A.     Certifying the Classes, as requested herein, certifying Plaintiffs as the representative of the Classes, and appointing Plaintiffs' counsel as counsel for the Classes;

B.     Ordering that Defendants are financially responsible for notifying all members of the Class of the alleged conduct discussed herein;

C.     Awarding Plaintiffs and the members of the Classes compensatory damages in an amount according to proof at trial;

D.     Awarding restitution and disgorgement of Defendants' revenues and/or profits to Plaintiffs and members of the Classes;

E.     Awarding Plaintiffs and the members of the Classes treble damages in an amount according to proof at trial;

F.     Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

G.     Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

H.      Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

I.      For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED:  June 10, 2016

By /s/ *Christopher R. Pitoun*

Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA  91101
Telephone:  (213) 330-7150
Facsimile:  (213) 330-7152
Email: christopherp@hbsslaw.com

Steve W. Berman
Thomas E. Loeser (SBN 202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: toml@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*