Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Evan Zucker (SBN 266702)
ezucker@baronbudd.com
Elizabeth Smiley (SBN 318165)
esmiley@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone:  (818) 839-2333
Facsimile:   (818) 986-9698

Steve W. Berman (*pro hac vice*)
steve@hbsslaw.com
Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594

Christopher R. Pitoun (SBN 290235)
christopherp@hbsslaw.com
Hagens Berman Sobol Shapiro LLP
301 North Lake Avenue, Suite 920
Pasadena, California 91101
Telephone:  (213) 330-7150
Facsimile:   (213) 330-7152

Attorneys for Plaintiffs
BARBARA WALDRUP, BECKIE
REASTER, REBECCA MURPHY
individually, and on behalf of those
similarly situated

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| BARBARA WALDRUP, individually, and on behalf of other members of the general public similarly situated,<br><br>           Plaintiff,<br><br>vs.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, et al.,<br><br>           Defendants. | Case Number:  2:13-cv-08833-CAS(AGRx)<br>CLASS ACTION<br><br>**PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES, LITIGATION COSTS, AND CLASS REPRESENTATIVE SERVICE AWARDS**<br><br>District Judge:  Hon. Christina A. Snyder<br><br>Date:          July 13, 2020<br>Time:         10:00 a.m.<br>Location:    Dept. 8D |

ELIZABETH WILLIAMS, BECKIE REASTER, REBECCA MURPHY, individually, and on behalf of all others similarly situated,

Plaintiffs,

vs.

COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, et al.

Defendants.

Consolidated with
Case Number:  2:16-cv-4166 CAS(AGRx)

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on July 13, 2020 at 10:00 a.m., in Courtroom 8-D of the above-captioned Court, located 350 W. First Street, 8th Floor, Los Angeles, California 90012, the Honorable Christina A. Snyder presiding, Plaintiffs Barbara Waldrup, Beckie Reaster, Rebecca Murphy ("Plaintiffs" or "Class Representative"), and the Certified Class will move and hereby do move this Court for an Order awarding attorneys' fees, reimbursement of costs, and Class Representative service awards. Plaintiffs seek attorneys' fees in the amount of $49,364,800.06, reimbursable costs incurred in litigating the case in the amount of $2,366,250.80, and service awards of $15,000 for each of the Class Representatives for their work in the prosecution of this case.

As discussed below in the Memorandum of Points and Authorities, this request by Plaintiffs and the Certified Class is consistent with authority in this Circuit and is provided for in the Settlement Agreement. As part of preliminary approval, notice was disseminated to Class Members, which disclosed all of the above requests and afforded Class Members an opportunity to object or comment on the requests; thus far, only one has only one has voiced an "objection" which does not appear to be compliant with the requirements for an objection.[1]

This Motion is based on: (1) this Notice of Motion and Motion; (2) the Memorandum of Points and Authorities in Support of Motion For An Award of Attorneys' Fees, Reimbursement of Expenses incorporated herewith; (3) the Declaration of Roland Tellis, and exhibits thereto, filed concurrently herewith; (4) the Declaration of Court-Appointed Mediator Eric D. Green, previously filed with Plaintiffs' Motion for Preliminary Approval (Dkt. 217-3); (5) the Declaration of Professor Brian T. Fitzpatrick,

---

[1] The Class Member has indicated a desire to obtain compensation for the "aggravation" caused by the Defendants. Consistent with the Preliminary Approval Order, Plaintiffs intend to file a supplemental submission in advance of the Court Approval Hearing updating these numbers and addressing any objections.

1  filed concurrently herewith; (6) the declarations of each of the Class Representatives, filed

2  concurrently herewith; (7) the records, pleadings, and papers filed, and documents

3  produced in, this litigation; and (8) such other documentary and oral evidence or argument

4  as may be presented to the Court at the hearing of this Motion.

5

6  Dated: May 11, 2020                                    BARON & BUDD, P.C.

7

8                                                          By: /s/ Roland Tellis
                                                               Roland Tellis

9

10                                                          Daniel Alberstone
                                                            Roland Tellis
11                                                          Mark Pifko
                                                            Evan Zucker
12                                                          Elizabeth Smiley
                                                            BARON & BUDD, P.C.
13                                                          15910 Ventura Boulevard, Suite 1600
                                                            Encino, California 91436
14                                                          Telephone:  (818) 839-2333
                                                            Facsimile:   (818) 986-9698
15

16                                                          Steve W. Berman
                                                            Hagens Berman Sobol Shapiro LLP
17                                                          1918 Eighth Avenue, Suite 3300
                                                            Seattle, WA 98101
18                                                          Telephone:  (206) 623-7292
                                                            Facsimile:   (206) 623-0594
19

20                                                          Christopher R. Pitoun
                                                            Hagens Berman Sobol Shapiro LLP
21                                                          301 North Lake Avenue, Suite 920
                                                            Pasadena, California 91101
22                                                          Telephone:  (213) 330-7150
                                                            Facsimile:   (213) 330-7152
23

24

25                                                          Attorneys for Plaintiffs
                                                            BARBARA WALDRUP, BECKIE
26                                                          REASTER, REBECCA MURPHY and the
                                                            Certified Class
27

28
                                                       Case No.:  2:13-cv-08833-CAS(AGRx)

# <u>TABLE OF CONTENTS</u>

PAGE

I.     INTRODUCTION...................................................................................1

II.    CLASS COUNSEL ZEALOUSLY LITIGATED THIS MATTER FOR
       OVER SEVEN YEARS..........................................................................3

       A.    Commencement of the Litigation ..............................................3

       B.    Defendants Repeatedly Challenged the Pleadings ....................3

       C.    The Lengthy Discovery Phase ...................................................5

             1.    Disputes Over ESI Production ........................................5

             2.    Disputes Over the Scope of Discovery ...........................6

             3.    Disputes Regarding Documents Withheld as Privileged ....................7

             4.    Disputes Over a Trial Plan .............................................7

             5.    Disputes Over Depositions of 3rd Party Absent Class Members ........8

             6.    Disputes Over Witness Depositions.................................8

       D.    Class Certification......................................................................9

       E.    Defendants' Motions for Summary Judgment, Decertification, and for
             Leave to File a Second Amended Answer..................................11

       F.    Mediation and Settlement ..........................................................11

III.   ARGUMENT .........................................................................................12

       A.    Plaintiffs Are Entitled to an Award of Attorneys' Fees and Costs
             Computed as a "Percentage of the Fund".................................12

             1.    Class Counsel Obtained an Exceptional Result ...............15

             2.    Class Counsel Bore the Entire Risk of Bringing This Case on a
                   Contingency Basis.........................................................15

             3.    Class Counsel Provided Exceptional Representation .........17

4.    The Fee Requested Is Consistent With Awards In Other Cases .........18

B.    A Lodestar Cross-Check Confirms the Reasonableness of the
Requested Fee Award ...................................................................................18

C.    The Requested Fees Are Not Disproportionate or the Result of
Collusion ........................................................................................................21

IV.   CLASS COUNSEL'S EXPENSES WERE REASONABLE AND
BENEFITED THE CLASS ....................................................................................22

V.    THE REQUESTED SERVICE AWARDS ARE REASONABLE ........................22

VI.   CONCLUSION ........................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguirre v. DirecTV, LLC,*
 No. CV 16-06836 SJO, 2017 WL 6888493 (C.D. Cal. Oct. 6, 2017) ..........................19

*In re Anthem, Inc. Data Breach Litig.,*
 No. 15-MD-02617-LHK, 2018 U.S. Dist. LEXIS 140137 (N.D. Cal. Aug. 17, 2018)......................................................................................................................20

*Barbosa v. Cargill Meat Solutions Corp.,*
 297 F.R.D. 431 (E.D. Cal. 2013) ..............................................................................15

*Bellinghausen v. Tractor Supply Co.,*
 306 F.R.D. 245 (N.D. Cal. 2015) ..............................................................................21

*In re Bluetooth Headset Prods. Liab. Litig.,*
 654 F.3d 935 (9th Cir. 2011).......................................................................... *passim*

*Boeing Co. v. Van Gemert,*
 444 U.S. 472 (1980) ....................................................................................................13

*Boyd v. Bank of Am. Corp.,*
 No. SACV 13–0561–DOC, 2014 WL 6473804 (C.D. Cal. Nov. 18, 2014)................15

*Buccellato v. AT&T Operations, Inc.,*
 No. C10–00463–LHK, 2011 WL 3348055 (N.D. Cal. Jun. 30, 2011)........................23

*Cook v. Niedert,*
 142 F.3d 1004 (7th Cir. 1998).....................................................................................27

*Craft v. County of San Bernardino,*
 624 F. Supp. 2d 1113 (C.D. Cal. 2008).......................................................................23

*Elliott v. Rolling Frito–Lay Sales, LP,*
 No. SACV 11–01730 ....................................................................................................15

*Fernandez v. Victoria Secret Stores, LLC,*
 No. CV 06–04149 MMM SHX, 2008 WL 8150856 (C.D. Cal. July 21, 2008)............................................................................................................................15

*Fox v. Vice,*
  563 U.S. 826 (2001) ....................................................................................20

*Glass v. UBS Fin. Servs., Inc.,*
  2007 WL 221862 (N.D.Cal. Jan. 26, 2007) ................................................27

*Gutierrez v. Wells Fargo Bank, N.A.,*
  No. C 07-05923 WHA, 2015 U.S. Dist. LEXIS 67298 (N.D. Cal. May 21,
  2015) .............................................................................................................22

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) ......................................................................24

*Hendricks v. StarKist Co.,*
  No. 13-CV-00729-HSG, 2015 WL 4498083 (N.D. Cal. July 23, 2015) ......19

*Hendricks v. Starkist Co.,*
  No. 13-cv-00729-HSG, 2016 WL 5462423 (N.D. Cal. Sept. 29, 2016) .......15

*Hensley v. Eckerhart,*
  461 U.S. 424 (1983) ......................................................................................21

*In re HP Inkjet Printer Litig.,*
  716 F.3d 1173 (9th Cir. 2013) ......................................................................14

*In re Informix Corp. Sec. Litig.,*
  No. C 97-01289-CB, 1999 U.S. Dist. LEXIS 23579 (N.D. Cal. Nov. 23,
  1999) .............................................................................................................20

*Jimenez v. O'Reilly Automotive Inc.,*
  No. SACV 12-00310 .....................................................................................16

*Kay Co. v. Equitable Production Co.,*
  749 F. Supp. 2d 455 (S.D. W. Va. 2010) .....................................................14

*Keegan v. Am. Honda Motor Co,*
  No. CV 10-09508 MMM, 2014 U.S. Dist. LEXIS 197404 (C.D. Cal. Jan.
  21, 2014) .......................................................................................................21

*Laguna v. Coverall North America, Inc.,*
  753 F.3d 918 (9th Cir. 2014) vacated as moot on other grounds 772 F.3d
  608 (9th Cir. 2014) ........................................................................................24

*In re Linerboard Antitrust Litig.*,
No. CIV.A. 98-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004), amended, No. CIV.A.98-5055, 2004 WL 1240775 (E.D. Pa. June 4, 2004) ...............27

*In re Lithium Ion Batteries Antitrust Litig.*,
No. 4:13-md-02420-YGR (MDL), 2019 U.S. Dist. LEXIS 139327 (N.D. Cal. Aug. 16, 2019) ........................................................................................19

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
No. 4:14-md-2541-CW, 2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) ........................25

*In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig.*,
No. 4:14-md-2541-CW, 2017 U.S. Dist. LEXIS 201108 (N.D. Cal. Dec. 6, 2017)..........................................................................................................22

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015)............................................... 14, 15, 16, 25

*Parkinson v. Hyundai Motor Am.*,
796 F. Supp. 2d 1160 (C.D. Cal. 2010)................................................21, 23

*In re Residential Doors Antitrust Litig.*,
No. 94-3744, 1998 WL 151804 (E.D. Pa. Apr. 2, 1998)............................27

*Rodriguez v. West Publishing Corp.*,
563 F.3d 948 (9th Cir. 2009)................................................................26

*Rutti v. Lojack Corp.*,
No. SACV 06–350 ............................................................................24

*Schroeder v. Envoy Air, Inc.*,
No. CV 16-4911-MWF, 2019 U.S. Dist. LEXIS 76344 (C.D. Cal. May 6, 2019)..........................................................................................................21

*Spicer v. Chicago Bd. Options Exchange, Inc.*,
844 F.Supp. 1226 (N.D. Ill. 1993) ........................................................26

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003)........................................................ *passim*

*Stuart v. Radioshack Corp.*,
No. C–07–4499 EMC, 2010 WL 3155645 (N.D. Cal. Aug. 9, 2010)..........15

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.,*
      2013 U.S. Dist. LEXIS 123298 ....................................................................22

*Van Vranken v. Atl. Richfield Co.,*
      901 F. Supp. 294 (N.D. Cal. 1995) ......................................................23, 27

*Villegas v. J.P. Morgan Chase & Co.,*
      No. CV 09-00261 SBA EMC, 2012 WL 5878390 (N.D. Cal. Nov. 21,
      2012).........................................................................................................27

*Vincent v. Hughes Air West,*
      557 F.2d 759 (9th Cir. 1977)....................................................................24

*Vizcaino v. Microsoft Corp.,*
      290 F.3d 1043 (9th Cir. 2002)...............................................15, 16, 20, 22

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab.
Litig.,*
      2017 U.S. Dist. LEXIS 39115....................................................................22

*In re Wash. Pub. Power Supply Sys. Sec. Litig.,*
      19 F.3d 1291 (9th Cir. 1994)...............................................................15, 17

*In Re Wells Fargo & Company Shareholder Derivative Litigation,*
      2020 WL 1786159 (April 7, 2020) ....................................................17, 18, 21

**Statutes**

Racketeering Influenced and Corrupt Organizations Act .........................*passim*

**Other Authorities**

Federal Rule of Civil Procedure 23 ...............................................2, 11, 13, 24

Federal Rule of Civil Procedure 26 .............................................................9, 10

MANUAL FOR COMPLEX LITIGATION, § 21.62, n. 971 (4th ed. 2013) ................25

4 NEWBERG ON CLASS ACTIONS § 11:38 (4th ed.)........................................25

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I. INTRODUCTION

3      For seven long years, Plaintiffs' counsel doggedly pursued Defendants

4  Countrywide Home Loans, Inc., Countrywide Financial Corporation, Bank of America,

5  N.A., Bank of America Corporation, LandSafe, Inc., and LandSafe Appraisal Services,

6  Inc. (collectively, "Defendants") for allegedly charging Class Members fees for home

7  appraisals that failed to comply with the Uniform Standards of Professional Appraisal

8  Practice ("USPAP"). Describing the litigation as protracted and contentious would be an

9  understatement. As the Court is well-aware, every fact was disputed, every legal

10  argument was contested, and every litigation tool was used by Defendants to defend

11  against Plaintiffs' claims. Indeed, even after this Court granted class certification of

12  Plaintiffs' nationwide claim for violation of the Racketeering Influenced and Corrupt

13  Organizations Act ("RICO"), Defendants sought review before the Ninth Circuit and,

14  when unsuccessful, they filed motions for decertification and summary judgment.

15      Along the way, Plaintiffs faced enormous financial and legal risk pursuing a

16  relatively novel legal theory. Indeed, in granting class certification, this Court noted that

17  Plaintiffs' novel RICO claim presented "a close question, particularly because the alleged

18  USPAP violation underlying plaintiffs' claims is based on an ethical standard that is

19  seldom, if ever, subject to judicial scrutiny." (Dkt. 248 at p. 35). And, as for Plaintiffs'

20  damages, the Court cautioned that "[i]n seeking a full refund [of the appraisal fees paid by

21  Class Members], plaintiffs will have the burden at trial to prove that defendant's USPAP

22  violations rendered the appraisals worthless to borrowers." (*Id.* at p. 37).

23      Despite these hurdles, Plaintiffs' counsel persisted, and achieved a remarkable

24  result. In the end, Defendants agreed to a $250 *million non-reversionary common fund*

25  settlement from which funds will be used to mail settlement checks directly to millions of

26  Class Members based on Defendants' records *without* the need for Class Members to

27  complete any claim forms or provide documentary "proof." In addition, the Settlement

28  provides for Defendants to pay up to an additional $2.5 million for settlement

administration costs.  The Settlement was a result of prolonged, spirited, arm's length negotiations during three in-person mediation sessions, between February 2019 and November 2019, with the Court-appointed mediator, Professor Eric D. Green, as well as numerous other telephonic and written discussions between the parties.  In view of the significant risks to both sides of continued litigation, the settlement indisputably is fair, adequate and reasonable for Class Members.

This victory, of course, required a persistent effort and a substantial allocation of resources by Class Counsel.  Having achieved a favorable settlement in a novel and difficult case, Plaintiffs and the Settlement Class now move the Court for an Order awarding attorneys' fees, reimbursement of litigation expenses, and Class Representative incentive awards.  Importantly, Class Counsel do not seek an undeserved windfall.  While substantial, the attorneys' fees requested are indisputably reasonable.  Although the Settlement Agreement permits Class Counsel to seek up to 25% of the settlement amount, the amount requested, $49,364,800.06 represents 19.75% of the total settlement amount, which is below the Ninth Circuit's 25% benchmark for fees awarded as a percentage of a common fund.  Moreover, to the extent the Court wishes to employ a "cross check" against Class Counsel's lodestar to ensure that the fees awarded are reasonable, the amount represents a reasonable 2.9 multiplier given the enormous risks and benefits achieved.  The request seeks fair and reasonable compensation for Class Counsel's time and effort, which resulted in substantial benefits to millions of Class Members, only after seven years of difficult work, without any guarantee of recovery or reimbursement of expenses, and consistent with the standards of Rule 23(h) and the law of this Circuit.

Finally, the Class Representative service awards represent payment for years of work by Plaintiffs on behalf of the Class, including communicating with counsel, reviewing and responding to written discovery, and participating in depositions and preparing for trial.  Without individuals like the Class Representatives who were willing to step forward and provide their time, effort, and patience, with no guarantee of success, this case, as well as the result achieved, would not have been possible.

Through perseverance against well-funded adversaries, Class Counsel were able to achieve an exceptional settlement for the Settlement Class.  Plaintiffs respectfully submit that their efforts should be fairly rewarded.

## II.   CLASS COUNSEL ZEALOUSLY LITIGATED THIS MATTER FOR OVER SEVEN YEARS

As described below, over a seven-year period, Class Counsel invested substantial time and money in prosecuting this case and achieving an settlement for the nearly 2.4 million class members that is indisputably fair, reasonable and adequate.

### A.   Commencement of the Litigation

On May 13, 2009, a plaintiff named Kyle Lagow filed a sealed *qui tam* complaint against Defendants, among others, for damages and civil penalties under the False Claims Act.  Declaration of Roland Tellis ("Tellis Decl.") at ¶ 4.  In May of 2012, Lagow's complaint was unsealed.  *Id.* But Lagow's *qui tam* action did not result in a refund to any of the borrowers who actually paid for the unlawful appraisals.  *Id.*

Accordingly, on November 27, 2013, Plaintiff Barbara Waldrup filed her initial complaint in this litigation.  *Id.* at ¶ 5.  Ms. Waldrup's complaint alleged that Defendants engaged in a scheme to create unlawful appraisals, misled customers about the quality and character of those appraisals, and then fraudulently billed borrowers for the "appraisal." *Id.* Ms. Waldrup's claim was in part based upon the allegations exposed by the unsealing of the Lagow *qui tam* action, as well as extensive independent investigation by her counsel.  *Id.*

The parties extensively, and at times contentiously, litigated this case through the pleading phase, the discovery phase, the class certification phase, and finally the trial preparation phase, in an effort to advocate for their respective clients' interests until resolving the case through a negotiated settlement that is objectively fair and reasonable.

### B.   Defendants Repeatedly Challenged the Pleadings

On January 24, 2014, Defendants filed their motion to dismiss the Complaint.  *Id.* at ¶ 7.  After full briefing and a hearing, the Court granted in part and denied in part Defendants' motion and gave Plaintiff leave to amend to address the Court's order.  *Id.*

3

On May 5, 2014, Plaintiff Waldrup filed her First Amended Complaint, and on May 22, 2014 and May 30, 2014 respectively, Defendants filed a motion to dismiss that complaint along with a supplement to their motion to dismiss. *Id.* Plaintiff opposed this motion on June 2, 2014, and after a hearing on the motion, the Court dismissed Plaintiff's First Amended Complaint without prejudice. *Id.* Plaintiff filed her Second Amended Complaint on August 18, 2014 and Defendants again filed a motion to dismiss that complaint on September 3, 2014. *Id.* After full briefing and a hearing, the Court granted in part and denied in part Defendants' motion. *Id.* Plaintiff filed a Third Amended Complaint on October 27, 2014, which was again challenged by a motion to dismiss but that motion, after full briefing and a hearing was denied in its entirety. *Id.* The Defendants answered on January 20, 2015. *Id.*

On June 10, 2016, four additional Plaintiffs filed another action against the Defendants alleging similar causes of action. *Williams, et al. v. Countrywide Financial Corporation, et al.* 2:16-cv-04166-CAS-AGR. On September 12, 2016, Plaintiffs filed a motion to consolidate the two cases before this Court. *Id.* at ¶ 8. Defendants opposed the motion to consolidate and sought a motion to stay the *Williams* matter instead. *Id.* On November 14, 2016, this Court granted Plaintiffs' motion to consolidate and denied Defendants' motion to stay as moot. *Id.* On December 21, 2016, Defendants moved to dismiss the *Williams* action. *Id.* In connection with this motion and extensive meet and confer efforts, Plaintiffs agreed to dismiss their third cause of action for violation of the Federal RESPA claim. *Id.* However, as to the other claims, on January 23, 2017, Plaintiffs' opposed Defendants' motion to dismiss. *Id.* Defendants filed a reply, and on March 13, 2017, after a hearing, Defendants' motion was granted in part, but denied as to the overlapping claims, including for violation of the Federal RICO act. *Id.* On April 10, 2017, Defendants answered the *Williams* complaint.

More than two years after their original answer to the *Waldrup* complaint, on June 29, 2017, the parties submitted a stipulation providing leave for Defendants to file an amended answer to Plaintiff Waldrup's complaint in which Defendants raised an

1    additional affirmative defense under the statute of limitations. *Id.* at ¶ 9.

2    **C.    The Lengthy Discovery Phase**

3          Plaintiffs engaged in substantial discovery that, among other things, informed the

4    allegations in their amended complaints, assisted with class certification and permitted

5    full trial preparation and case evaluation for settlement purposes. *Id.* at ¶ 10.

6          On April 14, 2015, shortly after the Defendants filed their initial answer, the parties

7    entered into a stipulated protective order to facilitate the production of requested

8    documents and information. *Id.* at ¶ 11.

9          Discovery was extensive.  In addition to the normal procedure of document

10   production pursuant to categorical requests, and after weeks of negotiations, the parties

11   entered into a detailed, negotiated ESI discovery protocol which resulted in the production

12   of more than 615,000 pages of documents, comprised of, among other things, email

13   correspondence, company procedures, and corporate documentation. *Id.* at ¶ 12.

14   **1.    Disputes Over ESI Production**

15          In preparation for the comprehensive document requests made by Plaintiffs, which

16   targeted the entire appraisal operation during the relevant period, the parties engaged in a

17   protracted dispute regarding the proper methodology for production of electronically

18   stored ("ESI") documents. *Id.* at ¶ 13.  After several in person and telephonic meet and

19   confer sessions, the parties agreed on a framework for the production of ESI documents

20   utilizing a custodial search method with carefully selected keyword search terms. *Id.* That

21   process produced in excess of 600,000 pages of documents. *Id.* Production of these

22   documents was made on a rolling basis beginning in 2015 and continuing for several

23   years throughout the litigation making the review process cumbersome and time

24   consuming. *Id.*

25          In order to address Defendants' claim of burden and that the number of custodians

26   requested and document search terms would produce a quantity of documents too large to

27   be produced, the Magistrate Judge ordered a phased production process with several

28   rounds of custodial production. *Id.* at ¶ 14.  After the first custodial production began,

Defendants the opposed production of documents maintained by the second phase of custodians. After several months of meet and confer efforts and twelve detailed meet and confer letters exchanged by the parties, Plaintiffs filed a motion to compel to get the second phase of custodial production. *Id.*

On June 9, 2016, the Court granted Plaintiffs' motion and ordered production of ESI documents for the second phase of custodians. *Id.* at ¶ 15. This compelled production resulted in the deposition of several of the phase two custodians, who would have likely been trial witnesses.

### 2.    Disputes Over the Scope of Discovery

In response to Plaintiffs' document requests seeking companywide policies and procedures related to appraisal practices during the relevant time period, Defendants opposed producing documents except those related to an internal lending division called "Full Spectrum Lending." *Id.* at ¶ 16. Following several in-person meet and confer conferences and multiple telephonic meetings in which Plaintiffs identified the discovery sought and the connection to the claims identified in Plaintiffs complaint, Plaintiffs filed a motion to compel Defendants' policies, procedures and practices documents related to lending divisions other than Full Spectrum Lending. *Id.*

Ultimately, the Magistrate Judge ordered production of documents related to each relevant lending division at Countrywide. Additionally, over opposition from Defendants, and with the help of the compelled documents, the Court certified a class of borrowers who were customers of Full Spectrum Lending, as well as Countrywide's other lending divisions. *Id.* at ¶ 17.

Plaintiffs also sought depositions of several whistleblowers related to Defendants' practices in connection with their appraisal business. In response, Defendants sought to quash those subpoenas on the grounds that they were not relevant. *Id.* at ¶ 18. The Magistrate Judge allowed the depositions to go forward, and testimony received from these third-party witnesses was used in the prosecution of Plaintiffs' claims. *Id.*

For example, in connection with Plaintiffs' motion for class certification,

Defendants sought to strike Plaintiffs' expert reports on the grounds that they were based on mere allegations from the whistleblowers. *Id.* at ¶ 19. However, those motions were ultimately denied by the Court, partially on the ground that the experts relied not on allegations, but on the sworn deposition testimony provided at these compelled depositions taken in this case. *Id.*

### 3.   Disputes Regarding Documents Withheld as Privileged

On August 30, 2016, after extensively meeting and conferring on the sufficiency of Defendants' privilege logs produced in connection with document discovery, Plaintiffs filed a motion to compel production of documents that they believed were insufficiently described as privileged. *Id.* at ¶ 20. *Defendants served a privilege log with in excess of 3,000 entries spanning more than 650 pages*. *Id.* Plaintiffs also argued that the privilege log failed to meet the federal requirements and contained insufficient detail to make a determination if Defendants' privilege claims were appropriate. *Id.*

On October 25, 2016, the Court granted Plaintiffs' motion and ordered Defendants to produce the withheld documents for *in-camera* review by the Court. *Id.* at ¶ 21. Due to the scope of the project, the Court agreed to appoint a special master, *at Plaintiffs' cost*, to undertake the *in-camera* review process. Pursuant to Court Order, Plaintiffs engaged retired judge Carla Woehrle, and worked in conjunction with Defendants to perform the extensive, time consuming review process. Based on the large number of documents withheld from production, the review process stretched on for 14 months, through December of 2017, and cost Plaintiffs tens of thousands of dollars. *Id.* The *in-camera* review project resulted in numerous documents being ordered de-designated as non-privileged and produced to Plaintiffs. Many of these documents proved useful in the prosecution of Plaintiffs' claims and would likely have been used as exhibits at trial. *Id.*

### 4.   Disputes Over a Trial Plan

In connection with their opposition to Plaintiffs' motion for class certification, Defendants repeatedly demanded a "trial plan" from Plaintiffs. *Id.* at ¶ 22. Plaintiffs objected to those demands, and after numerous meet and confer sessions, the Court noted

that it would not require such a trial plan in connection with class certification. *Id.*
Defendants nevertheless persisted.  In an effort to raise the issue before Magistrate
Rosenberg, Defendants re-sent their demand for a trial plan through a formal discovery
request. *Id.* Plaintiffs again objected on the grounds that (1) the requested "trial plan" had
already been addressed by the Court and (2) was effectively a demand for the exchange of
pre-trial information prior to the deadline for such information set by the federal rules. *Id.*
Despite dozens of demands for a trial plan, the Court rejected Defendants' requests. *Id.*

### 5. Disputes Over Depositions of 3rd Party Absent Class Members

Defendants then noticed the depositions of absent class members who had not
injected themselves into the litigation and were strangers to case (aside from being one of
2.4 million class members). *Id.* at ¶ 23.  Plaintiffs opposed the notices of these
depositions, and in response Defendants filed a motion to compel the depositions of 10
absent class members. *Id.* The Court accepted Plaintiffs' position that Defendants had
failed to adequately notice depositions of absent class members who may have
communicated with Class Counsel. *Id.*

As it relates to absent class members who Defendants alleged improper conduct, the
parties engaged in over a dozen meet and confer conferences, letters and informal
discovery dispute conferences with the Magistrate. *Id.* at ¶ 24.  As a result, the Plaintiffs
secured an agreement from Defendants that if an absent class member chose not to
participate in such a deposition, no adverse action could be taken against that individual.
Ultimately Defendants took the depositions of three absent class members across the
country and several other absent class members declined to participate in the requested
depositions with no adverse consequences. *Id.*

### 6. Disputes Over Witness Depositions

Defendants' Rule 26 disclosures identified dozens of potential witnesses, as well as
referencing documents, spreadsheets and company organizational charts that *identified
thousands of additional potential trial witnesses* to the claims asserted that Class Counsel
was forced to investigate. *Id.* at ¶ 25.  After substantial, but failed meet and confer efforts

8

Case No.:  2:13-cv-08833-CAS(AGRx)

to have Defendants pare down their initial disclosure list , Plaintiffs again filed a motion to compel. *Id.*

With trial nearing and the witness disclosure deadline looming, Plaintiffs again asked Defendants to narrow its list of potential witnesses to those who likely had discoverable information. *Id.* at ¶ 26. *Instead, Defendants amended their initial disclosures to expand the list. Id.* Defendants' final amended initial disclosures included reference to more than 100,000 witnesses. *Id.* Following extensive meet and confer conversations and correspondence, Plaintiffs filed a motion *in limine* in order to protect their rights to take the deposition of witnesses identified by Defendants on their trial witness list even after the discovery cut-off. *Id.* That motion was held in abeyance by the Court.

Despite the scale of this case, Defendants opposed Plaintiffs' right to take more than ten depositions. *Id.* at ¶ 27. Plaintiffs addressed the issue before the Magistrate and as a result of that effort, Class Counsel deposed twenty-six witnesses who were either employees, contractors or ex-employees of Defendants, including five 30(b)(6) depositions. *Id.* Additionally, Plaintiffs deposed Defendants' six identified expert witnesses designated in connection with Defendants' class certification opposition and their summary judgment motion. *Id.*

Also, Class Counsel defended depositions for each of the four named class representatives, as well as their spouses. *Id.* at ¶ 28, as well as absent class member depositions (spread around the Country) demanded by Defendants. *Id.*

Finally, Plaintiffs also attended multiple appraiser depositions in various locations around the country. *Id.* at ¶ 29. For example, Defendants noticed and Plaintiffs attended appraiser depositions in Oklahoma City, Oklahoma and Casper, Wyoming. *Id.*

### D.    Class Certification

Throughout this litigation, Plaintiffs persisted toward developing a factual and evidentiary record sufficient for an order of class certification. On August 28, 2017, Plaintiffs moved for certification, including of a nationwide class of nearly 2.4 million

borrowers.  *Id.* at ¶ 30.

Defendants vigorously opposed Plaintiffs' motion for class certification.  *Id.* at ¶ 31.  In connection with that opposition, Defendants submitted declarations of seven employees or ex-employees, three class-certification specific experts, as well as motions to strike Plaintiffs' expert opinions.  *Id.*

On November 6, 2017, Plaintiffs filed oppositions to Defendants' motions to strike their expert opinions in support of class certification.  *Id.* at ¶ 32.  Following that up, Plaintiffs filed their reply in support of the motion for class certification on November 13, 2017.  *Id.*

On December 4, 2017 the Court held oral argument with respect to Plaintiffs' motion for class certification and the associated motions to strike.  *Id.* at ¶ 33. Contemporaneous with the hearing the Court issued a tentative ruling granting class certification and denying Defendants' motions to strike.  At that time, Defendants also sought an order requesting the Court hold in abeyance the final order certifying the classes because of unavailability of Defendants' counsel during the Christmas and New Year time period (during which they would have otherwise had to prepare a petition to appeal the Court's order under Federal Rule of Civil Procedure, 23(f)).  *Id.* The Court having granted that order, certified the Plaintiffs' classes on February 6, 2018.  *Id.*

On February 22, 2018, Defendants filed their promised petition for permission to appeal the Court's class certification order under rule 23(f) and sought a stay of the case, pending the Ninth Circuit's decision on their petition.  *Id.* at ¶ 34.  On March 5, 2018, Plaintiffs opposed the motion for a stay and on March 12, 2018, Defendants filed their reply.  On March 26, 2018, the Court granted Defendants' stay only as to the provision of notice to class members.  *Id.*

Plaintiffs filed their opposition to Defendants' petition before the Ninth Circuit on March 8, 2018, and Defendants' Rule 23(f) petition for permission to appeal the class certification order was denied on May 22, 2018.  (9th Cir. Case No. 18-80024, Dkts. 3, 6.)

Subsequent to the Court's grant of class certification, Defendants contested the

form and format of Plaintiffs' proposed class notice plan. *Id.* at ¶ 36. After extensive meet and confer demands and discussions, the parties submitted the disputed notice plans to the Court. After eight months of disputes and negotiations over the notice plan, on December 17, 2018, the Court ordered Defendants to provide a class member list to the Class Administrator for fair and proper notice to be sent to each class member. *Id.*

### E.   Defendants' Motions for Summary Judgment, Decertification, and for Leave to File a Second Amended Answer

With trial scheduled to begin as early as January 14, 2020, on September 13, 2019, Defendants filed a motion for summary judgment seeking dismissal of Plaintiffs' claims, a motion for decertification of Plaintiffs' classes and a motion for leave to file a second amended answer. *Id.* at ¶ 37.

One month later, on October 14, 2019, Plaintiffs filed oppositions to Defendants' motion for summary judgment, motion for decertification, and motion for leave to file a second amended answer. *Id.* at ¶ 38. Additionally, Plaintiffs filed a motion to strike a declaration submitted in support of Defendants' motions and portions of Defendants' separate statement of facts. *Id.*

On December 28, 2019, Defendants filed replies in support of their motion for summary judgement, motion for decertification, and motion for leave to file a second amended answer. *Id.* at ¶ 39. In addition, Defendants opposed Plaintiffs' motions to strike their witness declaration and portions of their separate statement. *Id.*

Prior to the hearing on these fully briefing motions, and seven years after filing this lawsuit, the parties reached an agreement to settle this matter for the benefit of all 2.4 million class members for $250 million dollars. *Id.* at ¶ 40.

### F.   Mediation and Settlement

The proposed Settlement Agreement arises out of serious, informed, and non-collusive negotiations facilitated by a neutral, Court-appointed mediator, Professor Eric Green. Negotiations were difficult, protracted, and often spirited. The parties' negotiations were aided by Professor Green, an unbiased, experienced mediator, selected by the parties through a name and strike approach overseen by the Court. Professor Green

played a crucial role in supervising the negotiations and helping the parties bridge their differences and evaluate the strengths and weaknesses of their respective positions.

The Parties participated in three separate in-person mediations held in Boston in the year prior to the finalization of an agreed upon settlement.  On November 4, 2019, the Parties executed a settlement MOU. Subsequently, the parties spent weeks finalizing the terms of the release and settlement agreement, as well as the language of the related detailed exhibits.

## III.   ARGUMENT

### A.   Plaintiffs Are Entitled to an Award of Attorneys' Fees and Costs Computed as a "Percentage of the Fund"

"In a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).  Although this Court retains an "independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount," because the fees, costs, and incentive awards here are in a settlement context and are the subject of compromise, the Court need not subject the fees to the same level of scrutiny as when the fee amount is litigated.  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011); *Staton v. Boeing Co.*, 327 F.3d 938, 966 (9th Cir. 2003).

Where, as here, a class action settlement includes a settlement common fund, the Court may employ either of two methods to determine the reasonableness of a fee request: (a) the percentage-of-fund method; or (b) the lodestar method.  *Bluetooth*, 654 F.3d at 942.  The percentage-of-the-fund method, also known as the common-fund doctrine, allows attorneys' fees to be based on a percentage of the total recovery to the plaintiff class.  *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  The common fund doctrine recognizes that where a group of individuals receives a benefit from litigation without directly contributing to its costs, the group would be unjustly enriched unless each member is required to contribute a portion of the benefits to compensate the attorneys responsible for creating or enhancing the common fund.  "Thus, the common fund

12

Case No.:  2:13-cv-08833-CAS(AGRx)

doctrine ensures that each member of the winning party contributes proportionately to the payment of attorneys' fees." *Staton*, 327 F.3d at 967.

The modern trend among courts favors the percentage-of-the-fund approach because it "better aligns the interests of Class Counsel and Class Members . . . [by] t[ying] the attorneys' award to the overall result achieved rather than the hours expended by the attorneys." *Kay Co. v. Equitable Production Co.*, 749 F. Supp. 2d 455, 461 (S.D. W. Va. 2010). "[T]he most critical factor [in determining an appropriate attorneys' fee] is the degree of success obtained." *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013) (quoting *McCown v. City of Fontana*, 565 F.3d 1097, 1103–05 (9th Cir. 2009)). "Where both the class and its attorneys are paid in cash, this task is fairly effortless. The district court can assess the relative value of the attorneys' fees and the class relief simply by comparing the amount of cash paid to the attorneys with the amount of cash paid to the class. The more valuable the class recovery, the greater the fees award." *In re HP Inkjet Printer Litig.*, 716 F.3d at 1178–79 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). The percentage-of-the-fund approach also rewards counsel for efficiently and effectively bringing a class action case to a resolution, rather than prolonging the case in the hopes of artificially increasing the number of hours worked on the case. *Id.* at 462.

"Under the percentage-of-recovery method, the attorneys' fees equal some percentage of the common settlement fund; in this circuit, the benchmark percentage is 25%." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015) (citing *Bluetooth*, 654 F.3d at 942). The amount is calculated as a percentage of the total settlement fund, "including notice and administrative costs, and litigation expenses." *Id.*, at 953. However, the contingent nature of litigating a class action, the typical terms under which clients and law firms contract in the private marketplace, and the financial burden of advancing litigation costs can justify an increase from the 25% benchmark, because counsel litigate with no present payment and no guarantee of payment. *See Hendricks v. Starkist Co.*, No. 13-cv-00729-HSG, 2016 WL 5462423, at *12 (N.D. Cal. Sept. 29, 2016) (enhancement from 25% benchmark was warranted because class counsel carried a

1   substantial financial burden of contingent representation); *WPPSS*, 19 F.3d at 1299

2   ("Contingent fees that may far exceed the market value of the services if rendered on a

3   non-contingent basis are accepted in the legal profession as a legitimate way of assuring

4   competent representation for plaintiffs who could not afford to pay on an hourly basis

5   regardless whether they win or lose.").

6       In this case, under the percentage-of-recovery method, the requested

7   $49,364,800.06 in attorneys' fees are 19.55% of the total $252,500,000 Defendants agreed

8   to pay.  Accordingly, the fees are well below the 25% benchmark set forth by the Ninth

9   Circuit.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 949 (affirming fee

10  award of 25% of the overall settlement fund of $27,250,000); *Vizcaino v. Microsoft Corp.*,

11  290 F.3d 1043, 1046 (9th Cir. 2002) (affirming fee award of 28% of $96,885,000

12  settlement fund); *see also*, *Boyd v. Bank of Am. Corp.*, No. SACV 13–0561–DOC (JPRx),

13  2014 WL 6473804, at *8 (C.D. Cal. Nov. 18, 2014) (awarding 33% of $5,800,000

14  settlement); *Fernandez v. Victoria Secret Stores, LLC*, No. CV 06–04149 MMM SHX,

15  2008 WL 8150856, at *16 (C.D. Cal. July 21, 2008) (awarding 34% of the $8,500,000

16  common fund); *Elliott v. Rolling Frito–Lay Sales, LP*, No. SACV 11–01730 DOC, 2014

17  WL 2761316, at *10 (C.D. Cal. June 12, 2014) (awarding 30% of common fund); *Stuart*

18  *v. Radioshack Corp.*, No. C–07–4499 EMC, 2010 WL 3155645, at *6 (N.D. Cal. Aug. 9,

19  2010) (awarding 33% of common fund); *Barbosa v. Cargill Meat Solutions Corp.*, 297

20  F.R.D. 431, 450 (E.D. Cal. 2013) (awarding 33% of common fund).

21      Of course, courts must ensure that fee awards are reasonable.  *Bluetooth*, 654 F.3d

22  at 941; *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1294-95 n.2 (9th

23  Cir. 1994) ("WPPSS").  The relevant factors include: "(1) the results achieved; (2) the risk

24  of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the

25  fee and the financial burden carried by the plaintiffs; (5) awards made in similar cases;

26  and (6) a comparison of the percentage and lodestar methods." *Omnivision*, 559 F. Supp.

27  2d at 1046; *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir.

28  2015); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002).

Here, each of these factors supports the reasonableness of the award. *See* Fitzpatrick Decl. at ¶¶ 15-33. Indeed, this settlement is the result of more than seven years of fact finding, hard fought litigation and extensive settlement talks. In fact, a settlement was achieved only after multiple mediation sessions before a Court-appointed mediator, and even then, only after the parties had essentially completed the pre-trial process and were preparing for trial.

### 1. Class Counsel Obtained an Exceptional Result

The benefit obtained for the class is perhaps the single most important factor in determining the reasonableness of a fee request. *Bluetooth*, 654 F.3d at 942; *Omnivision*, 559 F. Supp. 2d at 1046. And the result here is exceptional. Class Counsel obtained a significant settlement on behalf of the class. As discussed more fully in the motion for preliminary approval granted by the Court on March 31, 2020 (Dkt. 475), and in the motion for final approval filed concurrently with this motion, Class Counsel achieved a *$250 million non-reversionary common fund settlement*, which by all accounts was based on a novel and difficult legal theory. Each Class Member will be reimbursed for a percentage (at least 22%) of the appraisal fees that were assessed by the Defendants. And, Class Members will receive payment automatically without a cumbersome claims requirement or a "prove up" process. Because the fund is non-reversionary, there is no risk of "low participation" or an incentive to discourage participation. This is, by any measure, an extraordinary result for Class Members.

### 2. Class Counsel Bore the Entire Risk of Bringing This Case on a Contingency Basis

"It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases." *WPPSS*, 19 F.3d at 1299. Here, the contingent nature of the representation meant that, from the outset of the case, there was a significant risk of nonpayment to Class Counsel because of the risk of non-recovery by the class. Class Counsel represented the class on a purely contingent basis, investing considerable time and money in the prosecution of the action without any guarantee that those investments

would ever be repaid.  *See In Re Wells Fargo & Company Shareholder Derivative Litigation,* 2020 WL 1786159, at * 9 (April 7, 2020)("The risk that Co-Lead Counsel took in litigation on a contingency basis – a risk they have borne for more than three years – also weighs in favor of a substantial attorney's fee award.")

Class Counsel took a significant financial risk in prosecuting this case, expending a substantial amount of time, money and resources on a contingent basis over the course of more than seven years, without any assurance of victory and with the singular focus of maximizing the recovery of Class Members.  Class Counsel's prosecution of this case was vigorously opposed by experienced and skilled attorneys representing Defendants zealously throughout the litigation.  As of April 30, 2020, Class Counsel collectively devoted 29,654 hours to this case, representing $17,022,344.85 in lodestar, and incurred $2,366,250.80 in out of pocket expenses.  Tellis Decl. at ¶¶ 50-55.  Indeed, Class Counsel will continue to incur additional attorney hours in connection with final approval, responding to inquiries from Class Members, interacting with the notice and claims administrator, and generally overseeing the implementation of the settlement.

Additionally, there were several material risks to recovery.  The Court initially dismissed Plaintiffs' complaint twice finding that Plaintiffs' claims were not plausible.  Yet Plaintiffs' counsel persisted in order to satisfy this Court's concerns.  Indeed, this Court cautioned that Plaintiffs' RICO claim presented "a close question, particularly because the alleged USPAP violation underlying plaintiffs' claims is based on an ethical standard that is seldom, if ever, subject to judicial scrutiny."  Dkt. 248 at p. 35.

Moreover, Defendants argued that that the appraisals in question were the product of tens of thousands of independent appraisers who were vested with individual discretion and Plaintiffs would be unable to meet their burden of proof without evidence that each appraiser violated USPAP.  In this regard, the Court "emphasize[d] that plaintiffs will be held to their theory of proof, in particular, uniform violations of USPAP's independence requirement must be proven through class-wide evidence of the allegedly improper relationship between LandSafe and Countrywide and their companywide policies and

practices." Dkt. 248 at p. 35.

Additionally, Defendants repeatedly raised a statute of limitations defense.  While Plaintiffs' allegations withstood that defense at the motion to dismiss stage, Defendants raised it again in connection with their motion for summary judgment.

And, as for Plaintiffs' damages, Defendants argued that Plaintiffs' full-refund model was flawed because appraisals were, in fact, completed, even if non-USPAP complaint, and borrowers benefited through successful loan closings and refinancings.  In this regard, in granting class certification, the Court again cautioned that "[i]n seeking a full refund, plaintiffs will have the burden at trial to prove that defendant's USPAP violations rendered the appraisals worthless to borrowers." *Id.* at p. 37.  Accordingly, given the obstacles Plaintiffs faced at trial, a recovery equal to 29.6% of the appraisal fees assessed to borrowers is unquestionably fair and reasonable.[2]

Had any of these risks materialized, they would have greatly diminished, if not eliminated, the potential recovery for the Settlement Class and increased the likelihood of nonpayment to Class Counsel.

### 3.    Class Counsel Provided Exceptional Representation

Class Counsel are experienced in complex class litigation and have expertise with consumer fraud, mortgage fraud, RICO, and other matters at issue in this case.  They have been regularly selected as lead counsel in complex class action cases in this District and elsewhere in this Circuit.

This litigation was not easy.  Defendants hired an army of effective counsel (at last count, Defendants had engaged three major law firms at one time), and had proven that

---

[2] Courts have approved fractional recoveries when the risk of proceeding to trial presents a substantial chance of recovering nothing.  *See Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1242 (9th Cir. 1998) (settlement amounting to a fraction of the potential total recovery was reasonable given the significant risks of going to trial); *Hendricks v. StarKist Co.,* No. 13-CV-00729-HSG, 2015 WL 4498083, at *7 (N.D. Cal. July 23, 2015) (settlement representing "only a single-digit percentage of the maximum potential exposure" was reasonable given the defenses and potential weaknesses in the plaintiffs' case).

they had the resources to defend themselves through trial and appeals.  The record shows that Class Counsel took their commitment and responsibilities to the entire Class seriously, and firmly believe that they have demonstrated throughout their representation that the Court made the correct decision in appointing them Class Counsel.

### 4.     The Fee Requested Is Consistent With Awards In Other Cases

The percentage fee request is well below awards in other large cases. Some megafund cases have awarded fees consistent with the 25% benchmark or even higher. *See, e.g, In re Lithium Ion Batteries Antitrust Litig.*, No. 4:13-md-02420-YGR (MDL), 2019 U.S. Dist. LEXIS 139327 (N.D. Cal. Aug. 16, 2019) (awarding 30% fee based on $113 million settlement fund); *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 U.S. Dist. LEXIS 140137 (N.D. Cal. Aug. 17, 2018) (awarding 27% fee based on $115 million settlement fund); *In re Informix Corp. Sec. Litig.*, No. C 97-01289-CB, 1999 U.S. Dist. LEXIS 23579 (N.D. Cal. Nov. 23, 1999) (awarding 29.2% fee based on $137 million settlement fund).

Academic research shows that reducing percentage fee awards incentivizes class counsel either to accept smaller settlement offers when larger ones were possible with a bit more work or to redirect their efforts away from bigger cases toward smaller cases. Neither of which is in the best interests of class members. *See* Fitzpatrick Decl. at ¶¶ 19-24. Even still, the average fee award in settlements around the size of the settlement here is 17.8% and the median is 19.5%, both in line with the request here.  *Id.*

### B.     A Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee Award

While an attorneys' fee award of 25% of the total settlement fund is presumptively reasonable, the Court may engage in a "cross-check" using the lodestar amount to ensure that Class Counsel is not receiving an unearned windfall.  The Ninth Circuit has observed that "[t]he lodestar method is merely a cross-check on the reasonableness of a percentage figure, and it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a

reasonable fee, since the lodestar method does not reward early settlement." *Vizcaino*,
290 F.3d at 1050 n.5. Indeed, "[t]he determination of fees 'should not result in a second
major litigation' and 'trial courts need not, indeed should not, become green-eyeshade
accountants.'" *Fox v. Vice*, 563 U.S. 826, 838 (2001). Nevertheless, should the Court
elect to do so, a lodestar cross-check confirms the reasonableness of the requested fee.

The lodestar is calculated by multiplying the number of hours reasonably expended
on the litigation by a reasonable hourly rate. *Bluetooth*, 654 F.3d at 941. Hourly rates
should be guided by the "experience, skill, and reputation of the attorney requesting fees"
as well as the prevailing market rates for similar work performed by attorneys of
comparable skill, experience, and reputation. *Chalmers v. City of Los Angeles*, 796 F.2d
1205, 1210-11 (9th Cir. 1986). "Courts may find hourly rates reasonable based on
evidence of other courts approving similar rates or other attorneys engaged in similar
litigation charging similar rates." *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d
1160, 1172 (C.D. Cal. 2010). "[I]t is well established that '[t]he lodestar cross-check
calculation need entail neither mathematical precision nor bean counting . . . [courts] may
rely on summaries submitted by the attorneys and need not review actual billing
records.'" *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 264 (N.D. Cal. 2015)
(citation omitted). Class Counsel's actual lodestar may be enhanced according to those
factors that have not been "subsumed within the initial calculation of hours reasonably
expended at a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 434 n.9
(1983) (citation omitted); *see also Morales*, 96 F.3d at 364.

To assist the Court in evaluating the reasonableness of the time spent on this Class
Counsel have presented a summary of their time records. Tellis Decl., at ¶ 50. Here, the
total lodestar is $17,022,344.85 based on 29,654 billable hours. Class Counsel's billing
rates are consistent with those charged by similarly experienced counsel in this District
and in this Circuit. *See Schroeder v. Envoy Air, Inc.*, No. CV 16-4911-MWF (KSx), 2019
U.S. Dist. LEXIS 76344, at *22-23 (C.D. Cal. May 6, 2019) (approving rates of $500 to
$890 for partners and $350 to $750 for associates); *Keegan v. Am. Honda Motor Co*, No.

CV 10-09508 MMM (AJWx), 2014 U.S. Dist. LEXIS 197404, at *66-68 (C.D. Cal. Jan. 21, 2014) (approving class counsel's hourly rates up to $875 for partners and $595 for associates); *In Re Wells Fargo & Company Shareholder Derivative Litigation*, *supra*, 2020 WL 1786159, at * 12 (approving of class counsel's hourly rates up to $1,075 for partners and $660 for associates); *Gutierrez v. Wells Fargo Bank, N.A.,* No. C 07-05923 WHA, 2015 U.S. Dist. LEXIS 67298, at *14-15 (N.D. Cal. May 21, 2015) (approving of rates that ranged for $475-$975 for partners and $300-$490 for associates where "counsel waited patiently for payment for several years" and "many of the claimed rates were comparable to those in our geographic region for the skill and experience involved."); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.,* 2013 U.S. Dist. LEXIS 123298, at *309 n.13 ("The hourly rates of class counsel range from $150 to $950. Class counsel's experience, reputation, and skill, as well as the complexity of this case, justify these hourly rates.").[3]

The current lodestar represents the total work Class Counsel have undertaken since the inception of the case through April 30, 2020.  The figure does not include any time Class Counsel will incur in the future ensuring the proper administration of the Settlement.

Applied to the requested fee, the lodestar cross-check yields a multiplier of 2.9. This is squarely within the range of multipliers approved in the Ninth Circuit.  *See Vizcaino*, 290 F.3d at 1051 (upholding multiplier of 3.65 and noting that range between 1 and 4 is typically appropriate, with slightly over half the cases surveyed awarding positive multipliers in the 1.5 to 3.0 range); *In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig.*, No. 4:14-md-2541-CW, 2017 U.S. Dist. LEXIS 201108, at *22 (N.D. Cal. Dec. 6, 2017) ("multipliers of 4.0 and above are frequently applied in granting fee awards from common

---

[3] *See also Hefler*, 2018 U.S. Dist. LEXIS 213045, at *38-39 (rates from $650 to $1,250 for partners or senior counsel, $400 to $650 for associates, and $245 to $350 for paralegals were reasonable); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 U.S. Dist. LEXIS 39115, at *732 (billing rates ranging from $275 to $1600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals reasonable).

funds"); *Gutierrez v. Wells Fargo Bank, N.A.*, No. C 07-05923 WHA, 2015 U.S. Dist. LEXIS 67298, at *25 n.3 (N.D. Cal. May 21, 2015) (multiplier of 4.53); *Buccellato v. AT&T Operations, Inc.*, No. C10–00463–LHK, 2011 WL 3348055, at *2 (N.D. Cal. Jun. 30, 2011) (approving percentage based fee award that represented multiplier of 4.3); *Craft v. County of San Bernardino*, 624 F. Supp. 2d 1113 (C.D. Cal. 2008) (approving 25% fee award with cross-check of 5.2 multiplier and collecting cases); *Parkinson*, 796 F. Supp. 2d at 1170 ("Where appropriate, multipliers may range from 1.2 to 4 or even higher."); *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298–99 (N.D. Cal. 1995) (multiplier of 3.6 was "well within the acceptable range for fee awards in complicated class action litigation"; "[m]ultipliers in the 3–4 range are common").

### C.    The Requested Fees Are Not Disproportionate or the Result of Collusion

The Court has a duty to ensure that any fee award in a class action settlement is free of collusion—*i.e.*, a situation where a Class Counsel accepts lower class relief in exchange for higher attorneys' fees. *Bluetooth*, 654 F.3d at 946. In discharging that duty, the Ninth Circuit has held that district courts must carefully scrutinize class settlements negotiated *prior* to formal class certification to determine whether a class action settlement is the product of collusion among the negotiating parties. *Id.* at 947.

Here, the Court can be assured that there has been no collusion among the parties. First, the Settlement was negotiated *after* class certification. Second, there is no evidence that the fees sought are disproportionate or the result of collusion. Both the lodestar and percentage-of-recovery methods of calculation support the reasonableness of the fees sought. Third, the settlement was reached only after multiple mediation sessions before Professor Eric Green, who submitted a declaration to this Court, detailing the spirited and contentious nature of the mediation sessions and the absence of collusion. Finally, the settlement does not allow any "excess" funds to revert to Defendants. The settlement requires Defendants to pay the entire $250 million, plus administrative and notice costs up to an additional $2.5 million.

In light of the significant monetary and nonmonetary relief to Class Members in the

Settlement Agreement, this Court should find that the fees sought are neither

disproportionate nor a result of collusion.

## IV.   CLASS COUNSEL'S EXPENSES WERE REASONABLE AND BENEFITED THE CLASS

Class Counsel are entitled to reimbursement for reasonable expenses that are

necessary and directly related to the prosecution of the action. *Vincent v. Hughes Air*

*West*, 557 F.2d 759, 769 (9th Cir. 1977); *Omnivision*, 559 F. Supp. 2d at 1048 ("Attorneys

may recover their reasonable expenses that would typically be billed to paying clients in

non-contingency matters."); *Staton*, 327 F.3d at 974; Fed. R. Civ. P. 23(h). Reimbursable

expenses include "'1) meals, hotels, and transportation; 2) photocopies; 3) postage,

telephone, and fax; 4) filing fees; 5) messenger and overnight delivery; 6) online legal

research; 7) class action notices; 8) experts, consultants, and investigators; and 9)

mediation fees.'" *Johnson v. General Mills, Inc.*, No.: SACV 10-00061-CJC(ANx), 2013

U.S. Dist. LEXIS 90338, *20-*21 (C.D. Cal. June 17, 2013); *Rutti v. Lojack Corp.*, No.

SACV 06–350 DOC (JCx), 2012 WL 3151077, at *12 (C.D. Cal. July 31, 2012).

Here, Class Counsel spent $2,366,350.80 in recoverable litigation costs in this case.

The costs are documented and were reasonable and necessary to prosecute this case.

Tellis Decl. at ¶ 54.  The expenditures were made for the direct benefit of the Settlement

Class and are reimbursable.

## V.    THE REQUESTED SERVICE AWARDS ARE REASONABLE

The parties agreed that the Court may, at its discretion, grant incentive payments to

the Class Representatives in the amount of $15,000 per Class Representative.  Class

Representatives each earned these incentive payments through their efforts on behalf of

the Class, over the course of many years.  Moreover, the amount requested is well within

the range of incentive payments approved in comparable cases.

"Incentive awards are fairly typical in class action cases…and are intended to

compensate class representatives for work done on behalf of the class, to make up for

financial or reputational risk undertaken in bringing the action and, sometimes, to

recognize their willingness to act as a private attorney general. *Rodriguez v. W. Publ'g*

22                    Case No.:  2:13-cv-08833-CAS(AGRx)

*Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009)(internal citations omitted).  In weighing whether to grant an incentive award, courts have considered other factors including personal difficulties encountered by the class representatives and the duration of the litigation.  *See Boyd v. Bank of Am. Corp.*, No. SACV 13-0561-DOC, 2014 WL 6473804, at *7 (C.D. Cal. Nov. 18, 2014)(citing *Van Vranken v. Atlantic Richfield Co.*, 901 F.Supp. 294, 299 (N.D. Cal. 1995); *see also*, 4 NEWBERG ON CLASS ACTIONS § 11:38 (4th ed.); MANUAL FOR COMPLEX LITIGATION, § 21.62, n. 971 (4th ed. 2013).

As detailed in each of the Class Representatives' declarations, the three Class Representatives spent a significant amount of time and effort assisting in the litigation. Each provided facts and documents necessary for the filing of a complaint.  *See* Class Representatives Declarations at ¶¶ 4-10.  Each Class Representative responded to more than twenty sets of written discovery.  *Id.* Responding to this exceptional volume of discovery requests required numerous hours working with Class Counsel to draft written responses and gathering hundreds of pages of documents.  *Id.*  In addition, each Class Representative sat for an all-day deposition.  *Id.*

In addition, Class Representatives' spouses were subpoenaed and deposed as third-party witnesses.  The Class Representatives could not have anticipated this additional burden when they began this litigation since none of their spouses were involved in the applying for the loan.  Nonetheless, each spouse prepared and appeared for their testimony in this matter which created additional burden and disruption for the Class Representatives.

Courts in this District have awarded the requested $15,000 incentive award in other class actions.  *See e.g. Raffin v. Medicredit, Inc.*, No. CV154912MWFPJWX, 2018 WL 8621204, at *7 (C.D. Cal. Nov. 30, 2018) (California Invasion of Privacy Act matter); *see also Boyd*, 2014 WL 6473804, at *7 (labor and employment matter).  As a relative percentage of the total settlement, the combined value of the incentive awards amount to only .017% of the total settlement.  This falls well below percentages for incentive awards accepted by the Ninth Circuit.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d

934, 947-48 (9th Cir. 2015) (holding that incentive awards totaling .17% of the settlement fund were appropriate).

Moreover, the requested incentive payments of $15,000 per Class Representative fall squarely within the range of payments approved in comparable cases. *See Staton*, 327 F.3d at 976 (approving an incentive payment of $25,000 to one named plaintiff who "spent hundreds of hours with his attorneys and provided them with `an abundance of information'"); *Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA EMC, 2012 WL 5878390, at *7 (N.D. Cal. Nov. 21, 2012) ($10,000 *without trial*); *Glass v. UBS Fin. Servs., Inc.*, 2007 WL 221862, at *16 (N.D.Cal. Jan. 26, 2007) ($25,000 *without trial*); *Van Vranken v. Atlantic Richfield Co.*, 901 F.Supp. 294, 299 (N.D. Cal. 1995) ($50,000); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998); *see also* Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303, 1308 (2006) (review of 374 opinions, average award was $15,992).

## VI.    CONCLUSION

The Settlement before the Court is the product of extensive, diligent litigation by Plaintiffs and Class Counsel.  Accordingly, Plaintiffs respectfully request that the Court award Class Counsel $49,364,800.06 in attorneys' fees and $2,366,250.80 in expenses, and granting $15,000 service awards to each of the Class Representatives.

Dated:  May 11, 2020                      BARON & BUDD, P.C.

                                 By: /s/ *Roland Tellis*
                                      Roland Tellis

                                      Daniel Alberstone
                                      Roland Tellis
                                      Mark Pifko
                                      Evan Zucker
                                      Elizabeth Smiley
                                      BARON & BUDD, P.C.
                                      15910 Ventura Boulevard, Suite 1600
                                      Encino, California 91436

MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND SERVICE AWARDS

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101

Christopher R. Pitoun
Hagens Berman Sobol Shapiro LLP
301 North Lake Avenue, Suite 920
Pasadena, California 91101

Attorneys for Plaintiffs
BARBARA WALDRUP, BECKIE
REASTER, REBECCA MURPHY
individually, and on behalf of those
similarly situated